**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JASJIT WALIA and PREET RANDHAWA,<br><br>    Plaintiffs-Relators,<br><br>    v.<br><br>JOSE ALEMPARTE *et al.*,<br><br>    Defendants. | Case No.: 1-18-cv-00510-RJL<br><br><br>JURY TRIAL DEMANDED |

**RELATORS' SECOND AMENDED COMPLAINT UNDER THE FALSE CLAIMS ACT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 7
II.     JURISDICTION AND VENUE ................................................................................. 8
III.    PARTIES ...................................................................................................................... 8
        A.    Relators ............................................................................................................. 8
        B.    Defendants ........................................................................................................ 9
IV.     THE LAW REGARDING DEFENDANTS' FALSE CLAIMS ............................. 10
V.      THE MEDICARE PROGRAM ............................................................................... 12
VI.     MEDICARE REIMBURSEMENT OF RADIOPHARMACEUTICALS ............... 13
        A.    Use of Radiopharmaceuticals in Nuclear Stress Tests ............................... 13
        B.    Radiopharmaceutical Suppliers .................................................................... 14
        C.    Medicare Reimbursement for RPs ................................................................. 15
        D.    Novitas Reimburses for RPs at Acquisition or Invoice Cost ...................... 17
VII.    DEFENDANTS' OVERBILLING SCHEME .......................................................... 18
        A.    Acquisition Cost for Tetrofosmin and Sestamibi is Far Less than $100 ................. 18
        B.    Defendants Bill Medicare in Violation of the Novitas RP Program Instruction ....... 21
VIII.   DEFENDANTS' LIABILITY UNDER THE FCA .................................................. 24
        A.    Defendants' Claims Are "False" Under 31 U.S.C. § 3729(a) ..................... 24
        B.    Defendants' "False" Records and Statements Under 31 U.S.C. § 3729(a)(1)(B) ..... 26
        C.    Defendants' Misrepresentations Are Material ............................................. 26
        D.    Defendants Acted with Scienter .................................................................... 27
        E.    Defendants' Violations of 31 U.S.C. § 3729(a)(1)(G) ................................. 29
IX.     COUNTS ..................................................................................................................... 30
        COUNT I – VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) .................................................. 30
        COUNT II – VIOLATION OF 31 U.S.C. § 3729(a)(1)(B) ................................................. 30
        COUNT III – VIOLATION OF 31 U.S.C. § 3729(a)(1)(G) ............................................... 31
PRAYER FOR RELIEF ....................................................................................................... 31

Relators Jasjit S. Walia and Preet Randhawa (collectively, "Relators") on behalf of the United States, bring this Second Amended Complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. against Defendants Jose Alemparte, Dario Espina, Michael Frais, Ronald Kantola, Kurt Spriggs, Rachel Brem, Brian Choi, Herman Gist, Richard Katz, Jocelyn Rapelyea, Amjad Rasul, Kamar Adeleke, Angel Alicea, Alvaro Buenano, David Grubbs, Vincent Marmo, George Moutsatsos, Ivan Pena-Sing, Andra Popescu Richard Simons, Esmond Barker, Ilyas Chaudhry, Wesley Davis, Miguel Depuy, Carl Fastabend, Richard Gilmore, Joseph Landreneau, Ghiath Mikdadi, Thomas Mulhearn, Cordel Parris, Luis Soto, Michael Turner, Srinivas Addala, Ramesh Agarwal, Ayim Akyea Djamson, Thomas Anthony, Ashwani Bassi, Rajeev Batra, Jennifer Brady, Michael Carlos, Mohammad Chaudhry, Terrance Collins, Juan Cordero, Jeffrey Cowen, Prakash Dalal, Tarek El-Sherif, Leighton Forrester, Anthony Frey, Harikisan Heda, Tomas Hernandez, Scott Jerome, Laurence Kelley, Wajeed Khan, Pankaj Lal, Louis Larca, Salvatore Lauria, Keith Lindgren, Tanveer Malik, Robert McCarthy, Homayoon Moghbeli, Mehrdad Mostaan, Sureshkumar Muttath, Vivek Nag, Vijayachandra Nair, Amir Najafi, Raymon Nelson, Feroz Padder, Brendon Paltoo, George Panas, Ramesh Patel, Amit Rajvanshi, Neena Rao, Ravinder Rustagi, Mohammad Sarfarazi, Michael Schwartz, Jorge Secada-Lovio, Jerome Segal, Mahmood Shariff, Gopalakrishnan Srinivasan, David Summers, Behnam Tehrani, Gaurang Thaker, Jeffrey Trabb, Vivek Varma, Julia Wen, Khalid Zirvi, Satjit Adlakha, Cyril Bethala, Pavel Khimenko, Berthrone Mock-Muhammad, Michael Payment, Richard Rayford, Simon Rizk, Malcolm Taylor, Roger Weiner, Tanveer Ahmad, Sujood Ahmed, Lawrence Antonucci, Graciano Avendano, Paul Barone, James Beattie, Lane Benoff, Benjamin Bergman, Walter Berkowitz, Gary Berman, Navtej Brar, Navin Budhwani, David Buyer, Raymond Catania, Ri Cha, Yee Chai, Michael Chen, Mathew Cholankeril, Gerald Cioce,

Andrew Costin, Maritza Cotto, John Covalesky, Mario Criscito, Manish Dadhania, Stephen Daly, Neeta Datwani, William Dilorenzo, Michael Dovnarsky, Maria Duca, Krishna Duvvuri, David Elbaum, Mark Finch, Thomas Galski, Manickam Ganesh, Alan Geisler, Yelena German, Mahesh Ghayal, Frederic Ginsberg, Darshan Godkar, Osler Jay Guzon, Isaac Halickman, Jacqueline Hollywood, Swarna Jayasinghe, Ahmad Kahf, V. Kate, Majid Khan, Anirudh Khanna, Steve Kim, Thomas Komorowski, Tatiana Krasikov, Ashok Kumar, Nidhi Kumar, Lekhraj Lala, Alfonso Lamorte, Pervaize Latif, Shahid Latif, Nathaniel Lebowitz, William Lee, Vijay Marwaha, Joanne Mazzarelli, Aditya Mehra, Yatish Merchant, Charles Miller, David Montgomery, Bipinpreet Nagra, Jeffrey Namey, Karan Nejad, Hamid Nia, Howard Noveck, Patrick O'Beirne, James Orlando, Louis Papa, John Passalaris, Jatinchandra Patel, Michael Phung, Christopher Pierson, Ashok Pilly, Ilyas Rajput, Younus Rakla, Douglas Richter, Constantine Rossakis, Howard Rothman, Lawrence Rozanski, Hector Rubinstein, Ralph Russo, Sajjad Sabir, John Saia, Madhu Salvaji, Anthony Sauerwein, George Saviano, Robert Schimenti, Scott Schwarz, Clifford Sebastian, Andrew Shanahan, Barry Shapiro, Bennett Shatkin, Timothy Slaven, Levi Sokol, Jay Stone, Ronald Strobel, Jay Sussman, Jeff Taylor, Samuel Ventrella, Danny Wang, Marcus Williams, Diane Zanger, Jing-Sheng Zheng, Robert Dubroff, Michael Gurule, Loutsios Ierides, Anthony Sandoval, Roy Abrahamian, Haitham Abughnia, Mohammad Al-Bataineh, Haytham Albizem, George Antalis, Abdulrab Aziz, Mukul Bhatnagar, Anthony Brandimarto, Floyd Casaday, Eric Chan, Gerald Devaughn, Farhad Elmi, Ronald Emmi, Brian Fedgchin, Jeffrey Fierstein, John Finley, John Fornace, Gordon Fried, Andrew Friedman, James Gallagher, Jack Garden, Lokesh Gowda, Robert Greco, Samir Hadeed, Tariq Hafiz, Paris Horan, Chau Fe Huang, Anwar Hussain, Jerome Itzkoff, Vijayaraghaven Janakiraman, Cherian John, Irina Joukova, Michael Kayal, Ziad Khoury, Gurpreet Kochar, Francis Lally, Karthik

Linganathan, Sanchita Mandal, Steven Mattleman, Ricci Minella, Steven Nierenberg, Philip Nimoityn, Charles Oschwald, Joseph O'Toole, Phillip Painley, Samir Pancholy, Prasant Pandey, Chandulal Patel, Nehal Patel, Scott Pfeffer, Chandra Polam, David Poll, Thomas Power, Madhava Rao, Sunder Rao, Joseph Richerts, Scott Riebel, Rajeev Rohatgi, Olga Shabalov, Mital Sheth, David Shipon, Farook Shroff, Ellen Smith, Jack Smith, Luis Tejada, Niku Thomas, Stephen Tunick, David Waldstein, Dean Wolz, Veerunna Yadagani, Siddhartha Acharya, Ahmed Ahmed, Fadi Alameddine, Abdul Ali, Asif Ali, Richard Ammar, David Ball, Avinash Bapat, Gary Barkocy, Anand Basi, Rafael Berio-Muniz, Karan Bhalla, Sanjeev Bhatia, Paris Bransford, Douglas Bree, Nirmal Bual, Thomas Buzbee, Daniel Caldwell, Sreenivasulu Cherlo, Vidyasagar Chodimella, Anand Cholia, Chris Cianci, Srikanth Damaraju, Anthony Davis, Blasi Michele Di, Jose Diaz, Fardin Djafari, Saritha Dodla, Robert Edmonson, Ved Ganeshram, Nisheeth Goel, Raymond Graf, Rajeev Grover, Anthony Gunawan, Arjumand Hashmi, Margaret Hayden, Gloria Hui, Ali Jaffar, Taysir Jarrah, Imtihan Jawdat, Rajan Kadakia, Amin Karim, Muhammad Khan, Mordecai Klein, Harish Koolwal, Hema Korlakunta, Sanjay Kunapuli, Miltiadis Leon, George Mammen, Wayne Margolis, Shamim Mawji, Mobeen Mazhar, Nilay Mehta, Lane Miller, Jamil (TX) Mohsin, Chandrase Nair, Angelo Nascimbene, George Nasser, Maher Nasser, Chau Nguyen, Tai Nguyen, Anil Odhav, John Overbeck, Biren Parikh, Dana Park, Robert Park, Dipsu Patel, Manu Pillai, James Richardson, Shehzad Sami, Michele Sartori, Shoaib Saya, Charles Schechter, Rakesh Shah, Manish Shroff, Stephen Sigal, Jaime Silva, Gregg Silverman, Amy Simpson, Rodolfo Sotolongo, Alan Taylor, Leonard Thome, Bhupendra Turakhia, Stephen Turner, Ramon Ty, Periyanan Vaduganathan, Michael Venincasa, Omesh Verma, Ramiro Villena, Antoine Younis, George Younis, Felix Castro, Cleveland Francis, Ambrish Gupta, Fareeha Khan, Rajesh Mehra, Pradeep Nayak, Minh Ngo, John O'Brien, David

Park, Nadeem Qazi, Narian Rajan, Kevin Rogan, Syed Shahab, Stuart Sheifer, Kinda Venner-Jones, George Reynolds,, Guniganti, Uma , Jad Daye,, Reyes, Guillermo , Jose Loyo-Molina, Beau Scott , Patrick Flaherty, Henry D Andrew, Carl Leding, Vasili Lendel, Jr. Gary Nash, Paixao Andrew , Anish Koka, Ayoubi Ali, Hameed Irfan, Masroor Khan, Avnish Tripathi, Martha Carr, Sameer Kaul, Robert Platt, Jonathan Tardos, Attiya Khan, Madhava Agusala, Khurram Ahmad, Nitin Mahajan, John Vanmetre, Hugo Quintana, Anthony Morales, Andrew Keenan, Syed Shah, Jawad Shaikh, William Wu, Raymond Stainback, Robert Sweet, Syed Umer, Archana Srivastava, Michael Siropaides, Steve Simpson, Robert Schnitzler, Alvaro Rios, Don Pham, Arun Padala, Joseph Navarijo, Sanjeev Nair, Michael Melucci, Deval Mehta, Narain Mangla, Lianxi Liao, Marcel Lechin, Mario Lammoglia, Abul Khan, Vijay Kalaria, Omar Hadidi, Fayez Hadidi, Laura Fernandes, Steven Feld, Denzil D'Souza, Eric Davis, Steven Daniels, Louis Cristol, Venkata Chilakapati, Peter Chang, Satish Chandraprakasam, Robert Card, Sukesh Burjonroppa, Sanjay Bhargava, Atul Trivedi, Neal Skop, Atif Shaikh, Seyed Saeid Sajadi Jahromi, Hong Ra, Henry Quevedo Diaz, Sunil  Patel, Mrugesh Patel, Manoj Muttreja, Bruno Manno, Asif Hussain, Anand Haridas, Matthew Evans, Jason Bradley, Kunal Bodiwala, Andrew Choi, Joseph Krepp, Daisy Lazarous, Desiree Younes, Brian Wosnitzer, Casey Wong, Viren Vankawala, Harry South, Ranjita Sengupta, Saugato Sanyal, Muhammad Rehan Raza, Jaffar Raza, Vineshkumar Patel, Tome Nascimento, Charles Marotta, John Lee, Yevgeniy Latyshev, Eduard Koman, Khaula Khalid, Umesh Katdare, Michael Kasper, Iftekhar Kadri, Alexander Ivanov, Frank Evans, Mohamed Elnahal, Rashmikant Desai, Ali Ahmad, Kabir Yousuf, Sadia Shafi, Boaz Rosen, Naga Pannala, Baran Kilical, Saifudin Hussein, Dawn Christopher, Sridhar Chatrathi, Jonathan Yager, Young Park, Bhanumathi Krishnan, Douglas Hill, Michael Banihashemi, Anthony Alfieri, Christine Dienna, Roderick Woods, Ihab Ajaaj,

Raghotham Patlola, Georges Khoueiry, Bruce Ennis, Percy Causey, Farhad Aduli, Michael Ryan, Ross Pacini, Enrique Orellana, Muhammad Azzouz, Erick Araneda, Maria Baldasare, Jennifer Shea, Kunal Teli, Fethi Benraouane, Georges Dahr, Adriana Nagy, Sheikh Ahmed, Tony Das, Thien Do, Robert Schlesinger, Ranga Rao, William Haaz, Jonathan Cox, Jay Silverstein, Frank M  Iacovone, and Hormoz Kianfar.

## I.    __INTRODUCTION__

1.      Cardiologists across the country utilize radiopharmaceuticals in connection with nuclear stress testing, which is one of the primary means of diagnosing coronary artery disease. Two of the most common radiopharmaceuticals used during nuclear stress testing – and the two radiopharmaceuticals at issue in this lawsuit – are sestamibi and tetrofosmin.

2.      Generally speaking, Medicare pays for the radiopharmaceuticals used in nuclear stress tests performed on Medicare beneficiaries. Medicare does this by authorizing Medicare Administrative Contractors ("MAC") to set reimbursement rates for radiopharmaceuticals. MACs are third-party contractors retained by Medicare to administer certain aspects of the Medicare program, including setting payment rules and processing reimbursement claims.

3.      Novitas Solutions, Inc. ("Novitas") is the MAC for millions of Medicare beneficiaries in Arkansas, Colorado, Louisiana, Mississippi, New Mexico, Oklahoma, Texas, Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania and certain areas of Virginia.

4.      In December 2013, Novitas adopted a clear payment rule that providers in its jurisdictions would only be reimbursed for radiopharmaceuticals at the cost actually paid for the radiopharmaceuticals. Thus, since at least December 2013, providers in Novitas jurisdictions are only permitted to bill Medicare for their acquisition cost for sestamibi and tetrofosmin.

5.      Relators are cardiologists practicing in New Jersey (a Novitas jurisdiction) who regularly purchase radiopharmaceuticals for use in nuclear stress tests.  At all times since the implementation of the Novitas payment rule, Relators have been able to purchase sestamibi and tetrofosmin for less than $40/dose.

6.      Defendants are cardiologists practicing in Novitas jurisdictions. In stark contrast to Relators' ability to acquire sestamibi and tetrofosmin at less than $40/dose, and in clear violation of the Novitas' payment rule, Defendants regularly billed for and received Medicare reimbursement between approximately $100/dose and $1,100/dose. In other words, Defendants have billed and received reimbursement from Medicare for drastically more than their acquisition costs for sestamibi and tetrofosmin in violation of Novitas' unambiguous payment rule.

7.      Defendants have collectively submitted hundreds of thousands of false claims for which they have received over $50 million in Medicare reimbursement. These false claims, and Defendants' related misconduct, violate the FCA.

## II.    <u>JURISDICTION AND VENUE</u>

8.      Jurisdiction is founded under 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. §§ 1331, 1345.

9.      Personal jurisdiction and venue are proper in the District of Columbia pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because at least one of the Defendants – including but not limited to Defendants Andrew Choi, Joseph Krepp, and Daisy Lazarous – have transacted business in the District of Columbia.

## III.   <u>PARTIES</u>

### A. **Relators**

10.     Relators are medical doctors and board certified cardiologists practicing in New

Jersey who utilize nuclear stress tests in their practices.

11.    As described in detail below, Relators became aware of non-public information concerning improper billing for radiopharmaceuticals for nuclear stress tests.

12.    Relators have standing to bring this action on behalf of the United States pursuant to 31 U.S.C. §3730(b)(l).

13.    Relators' complaint is not based on public disclosures of the allegations or transactions discussed herein within the meaning of 31 U.S.C. § 3730(e)(4)(A).

14.    Relators are original sources of the information provided herein within the meaning of 31 U.S.C. § 3730(e)(4)(B).

15.    Prior to the filing of this action, and prior to any public disclosure within the meaning of 31 U.S.C. § 3730(e)(4)(A), Relators voluntarily disclosed to the United States the information on which the allegations or transactions discussed herein are based.

**B. Defendants**

16.    Defendants are cardiologists or groups of cardiologists practicing in Arkansas, Colorado, Florida, Louisiana, Mississippi, New Mexico, Oklahoma, Texas, Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania and certain areas of Virginia who submitted inflated reimbursement claims to Medicare for sestamibi and tetrofosmin, including but not limited to, or through entities affiliated with Defendants or of which Defendants were a member or as part of an association or group practice or hospital with which they were associated before, during or after the time they submitted claims individually to Medicare for sestamibi and tetrofosmin.

17.    Defendants John Does 1-1000 (collectively, "John Doe Defendants") are other providers, practices, and entities located in Novitas jurisdictions who submitted inflated

reimbursement claims to Medicare for sestamibi and tetrofosmin, including but not limited to, entities or individuals affiliated with Defendants or of which Defendants were a member or as part of an association or group practice or hospital with which they were associated before, during or after the time they submitted claims individually to Medicare.

18.     Defendants, other than John Doe Defendants 1-1000, are listed in **Exhibit 1**.

## IV.     THE LAW REGARDING DEFENDANTS' FALSE CLAIMS

19.     The FCA "was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War." United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).

20.     The FCA "establishes a scheme that permits either the Attorney General or a private party to initiate a civil action alleging fraud on the Government," United States ex rel. Eisenstein v. City of New York, New York, 556 U.S. 928, 932 (2009) (citations omitted), and "imposes significant penalties on those who defraud the Government." Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1995 (2016).

21.     The FCA provides, *inter alia,* that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A), (B), (G).

22.     The terms "knowing" and "knowingly" mean "that a person, with respect to

information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).

23.    Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

24.    The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

25.    "[T]he term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

26.    "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

27.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099, 47103 (1999), the civil monetary penalties under the FCA are $5,500 to $11,000 for violations occurring on or after September 29, 1999 but before November 2, 2015. See 28 C.F.R. § 85.3.

28.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, the civil monetary penalties under the FCA were adjusted to $13,946 to $27,894 for violations occurring on or after November 2, 2015, subject to periodic adjustments. See 28 C.F.R. § 85.5.

## V.    THE MEDICARE PROGRAM

29.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as Medicare.

30.     At all times relevant to this Complaint, the Medicare Program is and was a federally funded and administered program intended to assist elderly Americans in paying for the cost of health care.

31.     The U.S. Department Health and Human Services oversees the Medicare program through the Centers for Medicare & Medicaid Services ("CMS").

32.     The Medicare Program works by reimbursing health care providers for the cost of services and ancillary items at fixed rates or pursuant to a standard, such as actual costs, and are made out of the Medicare Trust Fund.

33.     The Medicare Trust Fund is supposed to reimburse health care providers only for those services that were actually performed and were medically necessary for the health of the patient and that were ordered specifically by a physician, using appropriate medical judgment and acting in the best interest of the patient.

34.     The Medicare Trust Fund relies on the express and implied representations of the suppliers of Medicare services that the services billed are properly compensable.

35.     CMS contracts with private contractors referred to as fiscal intermediaries or Medicare Administrative Contractors ("MAC"), to act as agents in reviewing and paying claims

submitted by healthcare providers. See 42 U.S.C. § 1395h; 42 C.F.R. §§ 405.904(a), 421.3, 421.100; see also Am. Hosp. Ass'n v. Burwell, 812 F.3d 183, 185 (D.C. Cir. 2016) ("After a hospital or other health-care provider performs Medicare-eligible services, it submits a claim for reimbursement to a Medicare Administrative Contractor (MAC)" and "[t]he MAC decides whether to pay or deny the claim.").

36.    MACs are assigned to one or more geographic jurisdictions in the United States.

37.    MACs are authorized to adopt payment rules and policies pertaining to the reimbursement of certain services provided to Medicare beneficiaries, including with respect to RPs.

## VI.    MEDICARE REIMBURSEMENT OF RADIOPHARMACEUTICALS

### A. Use of Radiopharmaceuticals in Nuclear Stress Tests

38.    Coronary artery disease ("CAD") is a condition in which the vessels supplying blood to the heart muscle become stenosed (narrowed) due to the deposit of plaques or fatty substances on the inner walls of the blood vessels.  This results in decreased blood flow and ultimately heart failure if not treated properly.

39.    CAD can be diagnosed using a nuclear stress test.

40.    Nuclear stress tests typically utilize radiopharmaceuticals ("RP"), which are a combination of radioactive and pharmaceutical compounds.

41.    RPs are measured in terms of millicuries (mCi) or microcuries (μCi)) with 1 mCi=1,000 μCi.

42.    In a nuclear stress test, the patient receives an RP to analyze the function of the patient's heart.

43.    The doctor administers the RP through an intravenous injection.  The doctor then uses this radioactive drug to help identify those areas of the heart muscle that may be receiving

diminished or no blood.

44.    In nuclear stress testing, two RP doses are administered. One dose of an RP is typically administered before the heart is stressed by exercise or otherwise (the "resting dose"), and a second dose is administered after the exercise occurs (the "stress dose") to compare the areas affected.

45.    Typically, a dose of approximately 10 mCi is administered as the resting dose and approximately 30 mCi is administered as the stress dose.

46.    Accordingly, a total of approximately 40 mCi of the chosen RP is needed to perform and evaluate a nuclear stress test.

**B.  Radiopharmaceutical Suppliers**

47.    Sestamibi and tetrofosmin are two of the most common RPs utilized in nuclear stress tests. Together, sestamibi and tetrofosmin comprise well over 85% of the total sales of cardiac imaging agents in the United States.

48.    Cardinal Health, Inc. and GE Healthcare, directly or indirectly, supply most of the sestamibi and tetrofosmin to cardiologists.

49.    Cardinal Health, Inc. sells sestamibi under the trade name Cardiolite as well as other generic sestamibi imaging agents.

50.    GE Healthcare, a division of General Electric, manufactures and sells tetrofosmin under the trade name Myoview.

51.    Cardinal Health, Inc. and GE Healthcare are not accused of any wrongdoing in this action.

52.    Sestamibi and tetrofosmin are distributed as nonradioactive solids to radiopharmacies.

53.     Radiopharmacies then compound the products by, among other things, adding the radioisotope Tc-99m.

54.      Once the radioisotope is added, the product must be used within approximately 6 to 12 hours.

55.     As a result, radiopharmacies must be located within a reasonable proximity of the end-user physician customers, including Defendants.

56.     GE Healthcare manufactures and sells Myoview to independent radiopharmacies that distribute the imaging agent throughout the United States.  It also owns and operates its own radiopharmacies.

57.     Cardinal Health owns and operates over 160 radiopharmacies throughout the United States and sells Myoview and other cardiac imaging agents including Cardiolite.

**C.  Medicare Reimbursement for RPs**

58.     For billing purposes, providers indicate the type of service provided to a Medicare beneficiary using a code known as a Healthcare Common Procedure Coding System ("HCPCS") code, which are sometimes referred to by their non-Medicare counterpart, Current Procedural Terminology ("CPT") codes. See generally 45 C.F.R. § 162.1002.

59.     HCPCS codes are a collection of letters and/or numbers which represent procedures, supplies, products and services which may be provided to Medicare beneficiaries (and to individuals enrolled in private health insurance programs).  Each HCPCS code identifies with particularity the nature of the service performed or the cost reimbursed.

60.     HCPCS codes that begin with an "A" represent transportation services, medical and surgical supplies and radiopharmaceuticals.

61.     The series of codes from A9500 to A9572 include RPs used in nuclear stress tests.

62.     A9500 is the HCPCS code for sestamibi.

63.     A9502 is the HCPCS code for tetrofosmin.

64.     As noted above, Medicare reimburses providers for the cost of RPs they purchase for use in nuclear stress tests.

65.     Medicare reimburses for sestamibi and tetrofosmin on a "per study dose" basis.

66.     A "study dose" is the amount of RP required for one of the two imaging exams of a stress test.  When a provider obtains and a patient receives two separate doses of sestamibi or tetrofosmin for a nuclear stress test (one at rest and one at stress), this constitutes two study doses, and a claim to Medicare may properly reflect (when actually utilized) two study doses of either code A9500 or A9502.

67.     However, as further detailed below, doctors sometimes engage in "dose splitting" such that they need only obtain one dose of RP from a manufacturer and can then split the acquired dose into amounts needed for the rest and stress portions. Or the doctor can use RP leftover from another patient.  Under these circumstances, the provider may only lawfully bill for one dose since the provider only paid to obtain one dose.

68.     Section 303(c) of the Medicare Modernization Act of 2003 ("MMA") revised the payment methodology for drugs covered under Part B.

69.     Under the MMA, beginning January 1, 2005, drugs and biologicals are paid based on the Average Sale Price methodology ("ASP") and payment to providers is generally 106 percent of the ASP. See 42 CFR § 414.904.

70.     However, ASP reimbursement does not apply to RPs.

71.     As the Medicare Claims Processing Manual explains, "[t]he payment allowance limits for radiopharmaceuticals are not subject to ASP." CMS, Medicare Claims Processing

<u>Manual</u>, at Ch. 17 § 20.1.3 (last revised Feb. 14, 2024) <u>https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c17.pdf.</u>

72.    Rather, MACs "should determine payment limits for radiopharmaceuticals based on the methodology in place as of November 2003." <u>Id</u>.

73.    Consequently, MACs have adopted payment limits for reimbursement of RPs, including sestamibi and tetrofosmin.

74.    Because the MACs cover different geographic jurisdictions, the final dollar amount for RPs reimbursed by Medicare may vary from region to region based on the payment rules adopted by a specific MAC.

75.    As noted, when billing for RPs, a provider must adhere to the applicable payment rules of the MAC responsible for the geographic jurisdiction in which the provider is located.

**D.  Novitas Reimburses for RPs at Acquisition or Invoice Cost**

76.    Novitas is the MAC for two jurisdictions (JH and JL), comprised of the following areas and entities:

| Jurisdiction JH | Jurisdiction JL |
|---|---|
| Arkansas | Delaware |
| Colorado | District of Columbia |
| Louisiana | Maryland |
| Mississippi | New Jersey |
| New Mexico | Pennsylvania |
| Oklahoma | Virginia (only Arlington County, Fairfax County, and the City of Alexandria) |
| Texas | |
| Indian Health | |

| Veterans Affairs | |
|---|---|
| | |

77.    Novitas adopted the following payment rule concerning reimbursement for RPs in

both of its jurisdictions.

***Novitas Solutions will reimburse diagnostic radiopharmaceutical procedure codes based on the acquisition cost reported on the claim.*** If the total acquisition cost is not listed, the service will be denied. Details are provided in the complete article below.

The actual invoice is not required for payment of a diagnostic radiopharmaceutical procedure. As stated above, the total acquisition cost must be listed on the claim. Novitas Solutions, however, will conduct random audits to validate the information provided on the claim.  You will receive a request for the actual invoice if your claim is audited.

Coding guidelines
The acquisition cost should be reported in Block 19 or Block 24D of the 1500 claim form and in the 2400 loop NTE segment of an EMC claim.

Payment allowance will be made at 100% of the acquisition cost. If the acquisition cost is missing from the claim, the service will be denied. If an invoice is attached, this will be reviewed and considered for payment.

**Exhibit 2** (rule for Novitas JH); **Exhibit 3** (rule for Novitas JL) (hereinafter, the "Novitas RP

Program Instruction").

78.    Notice of the Novitas RP Program Instruction was published on December 1,

2013.

79.    Thus, any provider in a Novitas jurisdiction that billed Medicare more than the

provider paid to acquire an RP violated the Novitas RP Program Instruction.

## VII.    DEFENDANTS' OVERBILLING SCHEME

### A. Acquisition Cost for Tetrofosmin and Sestamibi is Far Less than $100

80.    In connection with the performance of nuclear stress tests, Relators obtain and

utilize sestamibi and tetrofosmin.

81.    At all times since December 1, 2013 through the present, Relators have been paying

less than $40 per dose for Myoview (tetrofosmin).

82.     The invoices attached as **Exhibit 5,** some of which are described below, are a representative example of the prices that Relators have paid for sestamibi and tetrofosmin since December 1, 2013.

83.     In September 2014, Relators obtained a 30 mCi dose of Myoview (tetrofosmin) from GE Healthcare at $35. Id. at 16.

84.     In May 2015, Relators obtained a 30 mCi dose of Myoview (tetrofosmin) from GE Healthcare at $35. Id. at 24.

85.     In August 2016, Relators obtained a 30 mCi dose of Myoview (tetrofosmin) from GE Healthcare at $35. Id. at 27.

86.     In May 2017, Relators obtained a 30 mCi dose of Myoview (tetrofosmin) from GE Healthcare at $36. Id. at 34.

87.      Relators obtained a proposed contract in 2017 for Myoview (tetrofosmin) from GE Healthcare. **Exhibit 6.**

88.     The cost in the proposed contract for Myoview (tetrofosmin) is $36 for 1-30 mCi and $1.20 for each additional mCi above 30 mCi. Id. at 3.

89.      The proposed contract contains a confidentiality provision covering the invoice price so the prices and terms are non-public. **Exhibit 7** at 1.

90.     Specifically, the proposed contract provides that "[e]ach party will treat the terms of this Agreement and the other party's written, proprietary business, or technical information as confidential." Id.

91.     In connection with the proposed contract, Relators communicated with a GE salesperson.

92.     The salesperson for GE Healthcare advised Relators that the 2017 contract price offered to them is in a competitive range in the marketplace and other cardiologists are paying similar amounts for these RPs.

93.      The GE Healthcare salesperson also advised Relators that she is responsible for sales in the entire east coast region, from Boston to Miami, and therefore knew the non-public information concerning prices in those states.

94.     Additionally, Relators privately obtained a document entitled "NOVATION Pricing: Nuclear Medicine Radiopharmaceuticals & Related Products." **Exhibit 8**.

95.     This document lists the price of generic sestamibi as $45 for 1-30 mCi and $1.50 for each additional mCi above 30 mCi. Id.

96.     This document also lists the price of Myoview (tetrofosmin) as $38.01/for 1-30 mCi and $1.27 for each additional mCi above 30 mCi. Id.

97.     Relators were also offered a contract in 2017 for generic sestamibi and tetrofosmin from Triad Isotopes, Inc. ("Triad"). **Exhibit 9**.

98.     The proposed contract offered a price of $33.50 for each 30 mCi dose of sestamibi. Id. at 7.

99.     The proposed contract offered a price of $37 for each 30 mCi dose of tetrofosmin. Id. at 7.

100.     The proposed contract contains a confidentiality provision so prices and terms are non-public. Id. at 3.

101.     Specifically, the proposed contract provides that "[e]ach party shall hold in strict confidence and not disclose to any third party, any non-public information . . . about the other party that is provided, shared or learned while performing their respective obligations described

in this Agreement." Id.

102.    In December 2019, Relators were invoiced at the rate of $37.70 for each 30 mCi dose of tetrofosmin (Myoview). **Exhibit 10**.

103.    In August 2020, Relators were invoiced at the rate of $37.70 for each 30 mCi dose of tetrofosmin (Myoview). **Exhibit 11**.

104.    In January 2021, Relators were invoiced at the rate of $37.70 for each 30 mCi dose of tetrofosmin (Myoview). **Exhibit 12.**

105.    In December 2022, Relators were invoiced at the rate of $38.97 for each 30 mCi dose of tetrofosmin (Myoview). **Exhibit 13**.

106.    In April 2023, Relators were invoiced at the rate of $40.50 for each 30 mCi dose of tetrofosmin (Myoview). **Exhibit 14**.

107.    As illustrated by the above-described invoices and contracts, the acquisition cost for sestambi and tetrofosmin ranged from approximately $35-$40/dose between 2013 and 2023.

108.    In addition to this documentary evidence, Relators have investigated RP prices in other areas of the country and have found that sestambi and tetrofosmin are available nationwide at prices far below $100, even when small volumes are purchased by doctors practicing in remote areas.

**B. Defendants Bill Medicare in Violation of the Novitas RP Program Instruction.**

109.    As identified in **Exhibit 1,** Defendants are physicians in Novitas jurisdictions across the United States.

110.    Defendants provided services using sestambi and tetrofosmin to Medicare beneficiaries for which they sought and received reimbursement from Medicare through Novitas.

111.    After December 1, 2013 (the effective date of the Novitas  RP Program

Instruction), Defendants have overbilled Medicare by seeking and receiving payment in excess of their acquisition costs for sestambi and tetrofosmin.[1]

112.    As detailed in **Exhibit 1,** in violation of the Novitas RP Program Instruction, Defendants sought and received payments drastically in excess of their acquisition prices. Some illustrative examples follow.

113.    In 2014, Defendant Thomas Komorowski in New Jersey submitted 664 claims to Medicare (through Novitas) for sestamibi and received an average Medicare reimbursement of $301/claim and submitted 664 claims, meaning that Dr. Komorowski was paid $200,319 by Medicare for sestamibi in 2014 alone.

114.    In 2019, Defendant Uma Guniganti in Oklahoma submitted 540 claims to Medicare (through Novitas) for sestamibi and received an average Medicare reimbursement of $545/claim.  Dr. Guniganti was paid $294,672 by Medicare for sestamibi in 2019 alone.

115.    In 2022, Defendant Saritha Dodla in Texas submitted 95 claims to Medicare (through Novitas) for tetrofosmin and received an average Medicare reimbursement of $349/claim.  Dr. Dodla was paid $33,247 by Medicare for tetrofosmin in 2022 alone.

116.    Every Defendant in **Exhibit 1** engaged in the same scheme by billing Medicare at far above than their acquisition cost for the RPs and by receiving average Medicare reimbursement of at least $100/dose.

117.    Utilizing the average reimbursement rate and a "cut-off" of more than $100/dose

---

[1] In addition to the above-described overbilling, upon information and belief, many providers exacerbate the fraud by double billing for RPs accomplished through "dose splitting." This refers to the process by which a provider acquires one dose of RP and thereafter splits it into two doses for use in the two phases (rest and stress) of stress testing. Dose splitting enables double billing where providers bill Medicare twice, even though they only initially paid a single acquisition cost.  The dose splitting fraud is exacerbated when perpetuated in tandem with the above- described threshold overbilling scheme, *i.e.*, when a provider bills for two doses and bills both doses at higher than the provider's acquisition cost.

is conservative for the reasons set forth below.

118.    **Exhibit 1** draws on the annual dataset that CMS periodically releases for Medicare Part B reimbursement claims and payments. Among other information, the dataset provides the "average Medicare payment amount" for each service (as defined by HCPCS code) billed by a provider.

119.    Utilization of "average Medicare payment amount" significantly *understates* the degree of Defendants' culpability because the "average Medicare payment amount" represents the "[a]verage amount that Medicare paid ***after deductible and coinsurance amounts have been deducted***."[2]

120.    Services covered by Part B are typically subject to an annual deductible and a 20% co-pay.[3]

121.    By way of illustration, if a provider acquired an RP for $40 but billed $125 for the RP, the 20% co-pay would be $25 ($125 x .2 = $25). Consequently, the "Medicare payment amount" would be $100, even though the doctor actually billed Medicare $125 even assuming the patient had already fully satisfied their annual deductible.

122.    Accordingly, Defendants actually billed Medicare much more than the "average Medicare payment amount" since that payment amount excluded any patient payments for their deductibles and co-pays.

---

[2] CMS, *Medicare Fee-For-Service Provider Utilization & Payment Data Physician and Other Supplier Public Use File: A Methodological Overview,* at 7 (Apr. 7, 2014), *available at* https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/medicare-provider-charge-data/downloads/medicare-physician-and-other-supplier-puf-methodology.pdf (emphasis added).

[3] CMS, *Medicare Deductible, Coinsurance, & Premium Rates:CY 2025 Update*, at 2-3 (Jan. 1, 2025), *available at* https://www.cms.gov/files/document/mm13796-medicare-deductible-coinsurance-premium-rates-cy-2025-update.pdf ("All enrollees are subject to a Part B monthly premium and most Part B covered services are subject to an annual deductible and coinsurance. … Part B Deductible: $257 a year … Part B Coinsurance: 20%").

123.    In addition, given patients' deductible and co-pay obligations, Defendants' overcharges directly resulted in financial harm to their patients. For example, if a defendant acquired two doses of RP for $40 each (*i.e.*, a total of $80), the patient's co-pay would be $16 (20% of $80). But if a defendant inflated his/her charges to $100 each (i.e., a total of $200), the patients' co-pay would be $40 (20% of $200).

124.    If the patient also had owed any money under their annual deductible – for example, if the stress test was conducted in January of any given year, when deductible values are reset– the financial harm to the patient would be increased.

## VIII.   DEFENDANTS' LIABILITY UNDER THE FCA

125.    As described below, Defendants' misconduct violated 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G).

### A.   Defendants' Claims Are "False" Under 31 U.S.C. § 3729(a)

126.    The FCA prohibits "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(a).

127.    Reimbursement claims presented by Defendants to Medicare (through Novitas) for RPs are "claims" within the meaning of the FCA, 31 U.S.C. § 3729(b)(2).

128.    Novitas is a "contractor, grantee, or other recipient" of federal funds within the meaning of the FCA's definition of claim. 31 U.S.C. § 3729(b)(2)(ii).

129.    Novitas uses federal funds "to advance a Government program or interest," namely the Medicare program. See 31 U.S.C. § 3729(b)(2)(ii).

130.    Reimbursement claims presented by Defendants to Medicare (through Novitas) in violation of the Novitas  RP Program Instruction are "false or fraudulent" within the meaning of the FCA.

131.    The claims are factually false because Defendants misrepresented the dollar value

at which they acquired sestamibi and tetrofosmin.  For example, a Defendant who submitted a claim representing that his acquisition cost was $100 – when in fact his acquisition cost was $40 – has submitted a factually false claim.

132.    The claims are also legally false under both express false certification and implied false certification theories of liability, as described below.

133.    With respect to the express false certification theory of liability, Defendants utilized CMS Form 1500 or the electronic equivalent when submitting reimbursement claims to Medicare. *See* **Exhibit** 15 (sample CMS Form 1500).

134.    When submitting claims, Defendants were required to list their individual national provider identifier ("NPI") number on the Claims.  Defendants' NPI numbers are unique to each individual provider. 45 C.F.R. § 162.406.

135.    Claims must be signed by each individual provider. For example, CMS Form 1500 requires the signature of the submitting physician. Ex. 15 at Box 31.

136.    Claims also require providers to make certain certifications.  For example, CMS Form 1500 required Defendants to expressly certify that he or she had ***"familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor . . . [and] this claim . . . complies with all applicable Medicare . . . laws, regulations, and program instructions for payment***." Ex. 15 at 2 (emphasis added).

137.    The Novitas RP Program Instruction is an "applicable Medicare . . . law[], regulation[], and program instruction[] for payment" within the meaning of CMS Form 1500.

138.    A reimbursement claim for RPs that seeks more than the claimant's acquisition cost violates the Novitas RP Program Instruction and thus does not "compl[y] with all applicable Medicare . . . laws, regulations, and program instructions for payment."

139.    Accordingly, Defendants' certification on every CMS Form 1500 that the claim complied with all Medicare program instructions is expressly false when made in connection with reimbursement for RPs above the Defendant's acquisition cost.

140.    With respect to an implied false certification theory of liability, by submitting a claim to Medicare for reimbursement, Defendants falsely implied that they had complied with all applicable Medicare laws, regulations, and program instructions for payment. Such representations were false, because Defendants' inflated invoices violated the Novitas RP Program Instruction.

**B.  Defendants' "False" Records and Statements Under 31 U.S.C. § 3729(a)(1)(B)**

141.    The FCA prohibits "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

142.    As described above, Defendants seek Medicare reimbursement by submitting claims form to Novitas through the CMS-1500 form or its electronic equivalent, and these forms require Defendants to provide accurate information and make various certifications.

143.    For the same reasons described above, Defendants' reimbursement claim forms were false when they sought reimbursement for RPs at amounts exceeding acquisition costs.

**C.  Defendants' Misrepresentations Are Material**

144.    Defendants' factual and legal misrepresentations underlying their FCA violations – that they were billing Medicare for the acquisition costs of RPs – are material.

145.    Under the FCA, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

146.    As noted above, the Novitas RP Program Instruction expressly instructed

Defendants to insert their acquisition costs in "Block 19 . . . of the 1500 claim form and in the 2400 loop NTE segment of an EMC claim."  Exhibit 2 at 1; Exhibit 3 at 1.

147.    Block 19 of the CMS 1500 claim form is titled "Additional Claim Information."

148.    The "2400 loop NTE segment" of an Electronic Media Claim ("EMC") refers to a specific section within the EMC where claimants add additional claim information.

149.    Here, Defendants inserted false acquisition costs in "Block 19 . . . of the Form 1500" and/or inserted false acquisition costs "in the 2400 loop NTE segment of an EMC claim."

150.    Novitas paid the claims that Defendants submitted based on Defendants' falsely inflated acquisition costs.

151.    More specifically, the amount of money Novitas paid for Defendants' RP claims is based on the falsely inflated acquisition costs Defendants certified to Novitas.

152.    Had Defendants accurately represented their acquisition costs, Novitas would have paid Defendants the correct amount.

153.    For example, if a Defendant accurately stated an acquisition cost of $40, Novitas would pay $40 for that claim less any deductible and co-pays from the patients.

154.    Conversely, if a Defendant falsely stated an acquisition cost of $250, Novitas would pay $250 for that claim less any deductible and co-pays from the patients.

155.    Defendants' false claims and statements therefore directly impacted the payment of money. Consequently, Defendants' misrepresentations were not only "capable of influencing the payment of money," but actually and directly did so.

**D.  Defendants Acted with Scienter**

156.    Defendants acted "knowingly" within the meaning of the FCA. *See* 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).

157.     Over a century ago, Justice Holmes observed that "[m]en must turn square corners when they deal with the Government." *Rock Island, A. & L.R. Co. v. U.S.,* 254 U.S. 141, 143 (1920). Citing Justice Holmes, the Supreme Court more recently reasoned  that  "[p]rotection  of the   public   fisc  requires  that  those who seek public funds act with scrupulous regard for the requirements of law." *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467  U.S.  51, 63   (1984). Consequently, "[a]s a participant in the Medicare program, [a provider has] a duty to familiarize itself with the legal requirements for cost reimbursement." *Id*. at 64.

158.     Apart from binding legal precedent, the individual responsibility of each defendant to meet this responsibility is factually expressed in the certifications Defendants made on every one of the claims themselves, which specifically include language tying the legal obligation to the individual doctor who submitted (or who caused to be submitted) the Claim.  **Exhibit 15** at 2 (CMS Form 1500) ("In submitting this claim for payment from federal funds, I certify that: I) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable  laws,  regulations,  and  program  instructions,  which  are  available  from  the  Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) ***this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment*.**") (emphasis added).

159.     Moreover, the clarity of the Novitas RP Program Instruction – which pointedly, directly, and unambiguously required Defendants to report their acquisition costs and nothing more – further substantiates that Defendants' misconduct was, at minimum, reckless. Similarly, the drastic degree to which Defendants falsely over-reported their acquisition costs displays their culpable mental state. *See U.S. v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 447 (S.D.N.Y. 1999) ("The clarity of the falsity supports the United States's position that a failure to know of

the falsity was at least reckless").

### E.  Defendants' Violations of 31 U.S.C. § 3729(a)(1)(G)

160.   Defendants who do not return all overpayments within 60 days of receiving this complaint will have independently violated 31 U.S.C. § 3729(a)(1)(G) through their failure to timely return overpayments caused by their overbilling.  *See* 31 U.S.C. § 3729(b)(3) (defining "obligation" to include "the retention of any overpayment"); 42 U.S.C. 1320a-7k(d)(3) (providing that "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment … is an obligation" under the FCA).

161.   Providers are required to return overpayment within "60 days after the date on which the overpayment was identified." 42 U.S.C. 1320a-7k(d)(2); 42 C.F.R. § 401.305(b) (corresponding regulatory requirement).

162.   ***At the latest***, the 60-day time period was triggered by Defendants' receipt of this complaint, which specifies each individual defendant's liability.

163.   Accordingly, any failure by any defendant to return the overpayments within 60 days independently violates the FCA. See Fed. Rule Civ. Pro. 8(a), (d); *see U.S .v. Omnicare, Inc.,* 2021 WL 1063784, at *12 (S.D.N.Y. Mar. 19, 2021) (explaining that "the government is permitted to plead theories in the alternative" and that "[i]f discovery demonstrates that Omnicare failed to knowingly submit false claims to the government for reimbursement … then it may not be liable for the two conventional FCA counts" but that "if discovery also reveals that Omnicare improperly kept the reimbursements after the payments were determined to have been made in error, then the government's reverse false claim takes on independent significance, as Omnicare could still be liable based only on that theory of liability").

IX.    **COUNTS**

**COUNT I – VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**

164.    Relators repeat and re-allege each and every allegation above as though fully set forth herein.

165.    In violation of 31 U.S.C. § 3729(a)(1)(A), Defendants knowingly presented or caused the presentment of false or fraudulent claims for payment or approval to (1) the United States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

166.    Defendants acted with actual knowledge of the falsity of their claims, with deliberate ignorance of the falsity of their claims, or with reckless disregard as to the falsity of their claims.

167.    By virtue of the false or fraudulent claims that Defendants presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT II – VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)**

168.    Relators repeat and re-allege each and every allegation above as though fully set forth herein.

169.    In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the United States or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

170.    The false records and statements made by Defendants had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the

payment of the claims.

171.    Defendants acted with actual knowledge of the falsity of their statements or records, with deliberate ignorance of the falsity of their statements or records, or with reckless disregard as to the falsity of their statements or records.

172.    By virtue of the false records and statements made, used, or caused to be made or used by Defendants, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

### COUNT III – VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)

173.    Relators repeat and re-allege each and every allegation above as though fully set forth herein.

174.    In violation of 31 U.S.C. § 3729(a)(1)(G), Defendants knowingly made, used, and/or caused to be made or used false records and statements material to an obligation to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

175.    By virtue of Defendants' conduct, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each violation.

### PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of the United States demand that judgment be entered in their favor and against Defendants for:

(1) Three times the amount of damages to the United States;

(2) Civil penalties of (a) $5,500-$11,000 for each violation of the FCA that occurred after September 29, 1999 but before November 2, 2015 and (b) $13,946 to $27,894 for each

violation of the FCA that occurred on or after November 2, 2015, or within the ranges that exist on the date such penalties are assessed;

(3) Any other recoveries or relief provided for under the FCA;

(4) Relators' receipt of the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs, based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action; and

(5) Such other relief as the Court may deem appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: February 11, 2025                    /s/  *Jonathan Z. DeSantis*

**BARON & BUDD, P.C.**

W. Scott Simmer (D.C. Bar #460726)
The Watergate, Suite 10-A
600 New Hampshire Avenue, NW
Washington, D.C. 20037
Telephone:202-333-4562
Facsimile:  202-337-1039
Email: ssimmer@baronbudd.com

**LAW OFFICE OF HENRY F. FURST**

Henry F. Furst *(*admitted *pro hac vice*)
One Claridge Drive
Verona, New Jersey 07044
Telephone: (973) 454-2620
Email: hfurst@hfurstlaw.com

**WALDEN MACHT  HARAN & WILLIAMS LLP**

32

Daniel R. Miller *(*admitted *pro hac vice*)
Jonathan Z. DeSantis (admitted *pro hac vice*)
Walden Macht & Haran LLP
2000 Market Street, Suite 1430
Philadelphia, PA 19103
Tel: (215) 825-5283
Email: dmiller@wmhwlaw.com
Email: jdesantis@wmhwlaw.com

***Attorneys for Relators***