**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* Jasjit Walia and Preet Randhawa, | ) | |
| | ) | |
| Plaintiff-Relators, | ) | |
| | ) | |
| | ) | Case No. 1:18-cv-00510-RJL |
| v. | ) | |
| | ) | |
| Jose Alemparte, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANT AVNISH TRIPATHI, M.D.'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

**STATEMENT OF FACTS AND PROCEDURAL HISTORY** ..........................................1 - 4

**LEGAL STANDARDS** ................................................................................................. 4 - 6

   I.  Pleading Requirements under Rule 12(b)(6) ................................................ 4 – 5

   II.  FCA claims must satisfy the pleading requirements of Rule 8(a)
     and Rule 9(b) ...................................................................................................... 5 – 6

   III. Required Elements for a Valid FCA Claim ...................................................6

**ARGUMENT** ............................................................................................................ 7 - 36

   I.  Relators' allegations against Dr. Tripathi pertaining to claims submitted before July 15, 2022
     cannnot proceedas a matter of law. ................................................................ 8 - 12

     A.  The same Relators already have dismissed with prejudice all but five months of the
       claims they allege Dr. Tripathi fraudulently submitted. ........................................9

     B.  Dr. Tripathi did not practice cardiology in a Novitas jurisdiction
       until July 15, 2022. ....................................................................................... 10 - 12

   II.  Relators fail to sufficiently allege that Dr. Tripathi submitted any
     false claims to Medicare.............................................................................. 12 - 32

     A.  Dr. Tripathi was not purchasing radiopharmaceuticals nor submitting claims for their
       costs............................................................................................................ 13 - 14

     B.  Relators have not sufficiently alleged the "who, what, when, and where" with respect to
       Dr. Tripathi's involvement in submitting any false claims.......................... 14 - 29

       1.  "Who" – The failure to allege Dr. Tripathi's role is fatal to Relators' claims......15 - 17

       2.  "What" – The SAC fails to allege "with particularity the circumstances' supporting
         the falsity element of an FCA claims against Dr. Tripathi .................................... 18 - 27

         a.  The SAC does not identify a single false claim
           submitted by Dr. Tripathi............................................................. 18 - 21

         b.  The SAC fails to allege specific details of a fraudulent scheme paired with reliable
           indications that Dr. Tripathi submitted any false claim .................................. 21 - 27

       3.  The SAC fails to allege the "where" and "when" aspects
         of the falsity element ......................................................................... 27 – 28

4.   The SAC's lack of particularity prevents Dr. Tripathi
from adequately responding.................................................................28 - 29

C.  The SAC contains no specific allegations supporting a false certification claim .......29 - 30

D.  Relators fail to allege the scienter element of any FCA claim
against Dr. Tripathi ...............................................................................30 - 32

III. The SAC fails to sufficiently allege that Dr. Tripathi violated the reverse
false claim provision ..............................................................................32 - 33

IV. Relators have not met the standard for joinder under Rule 20(a).....................................34 - 35

V.  As related to Dr. Tripathi, Relators should not be permitted to amend their
complaint again.................................................................................35 - 36

CONCLUSION..................................................................................................36 - 37

Defendant, Avnish Tripathi, M.D., by and through counsel, respectfully submits this Memorandum of Points and Authorities in Support of his Motion to Dismiss the Plaintiff-Relators' Second Amended Complaint (hereinafter "SAC") against him pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The Plaintiff-Relators brought suit against multiple Defendants pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.* The FCA, originally enacted in 1863 during the Civil War, allows private persons called Relators who have information regarding false or fraudulent claims submitted to a government entity to bring suit on behalf of the United States and share in the recovery, if any. An FCA complaint is initially filed under seal while the Government conducts an investigation and determines whether to join the action. The Plaintiff-Relators in this case, Jasjit Walia and Preet Randhawa ("Relators"), claim they are cardiologists practicing in New Jersey who purchase and use radiopharmaceuticals in nuclear stress tests. [R. 48, ¶ 5.] Relators allege that all Defendants are cardiologists who have billed for and received from Medicare higher amounts than their acquisition costs related to certain radiopharmaceuticals. As a result, Relators allege that all named Defendants have "collectively submitted" false claims for Medicare reimbursements in violation of the False Claims Act. [*Id.*, ¶¶ 6-7.]

Relators initially filed their Complaint under seal on March 5, 2018. [R. 1.] It was later amended July 18, 2023, remaining under seal. [R. 21.] On December 9, 2024, the United States subsequently chose to intervene against several of the named Defendants for the purpose of negotiating settlements. [R. 33, R. 39.] However, the United States declined to join the suit against the remaining Defendants, including Dr. Tripathi. Relators chose to continue pursuing their claims against the other Defendants without the United States' continued involvement. On February 12, 2025, Relators moved to amend the Complaint a second time, to remove the Defendants with whom

the United States had reached a settlement agreement, purportedly to "provide additional clarity and details concerning [their] allegations of falsity, materiality, and scienter," as well as to add reverse false claims allegations.[1]  [R. 46.]  The Court granted Relators leave to do so, and on April 7, 2025, the Relators filed their Second Amended FCA Complaint ("the SAC") against over 530 remaining Defendants, including Dr. Tripathi.  [R. 48.]

On April 25, 2025, Relators sent Dr. Tripathi a copy of the SAC, which he received several weeks later (as it was sent to the wrong address) and for the first time realized he was a named Defendant in this lawsuit.  Dr. Tripathi did not recognize the names of the other Defendants and is not aware of any association he has or may have had with any of them.  On June 18, 2025, Dr. Tripathi filed an Unopposed Motion to extend his response deadline to July 21, 2025, which the Court granted. [R. 169.]  As further explained below, Dr. Tripathi's name appears only one time in the SAC – on page 6 in the introductory list of named Defendants.  The SAC itself does not include any allegations specific to Dr. Tripathi, and Relators' allegations against him must be inferred from four lines in a spreadsheet attached as Exhibit 1 to the SAC, which is the only other place his name appears.

In its most recently amended form, the SAC's allegations span a period of time from December 2013 to the present.  The SAC's allegations are entirely based on the purchasing of two radiopharmaceuticals – sestamibi and tetrofosmin – used in nuclear stress tests, and the subsequent billing of those radiopharmaceuticals to Medicare in order to receive reimbursement for their cost. [SAC, ¶¶ 62-66.]  The SAC alleges that all Defendants "are physicians in" areas of the United States in which the Novitas MAC (Medicare Administrative Contractor) administers reimbursement for Medicare claims."  [*Id.* ¶¶ 6, 35, 76, 109-110.]  The SAC further alleges that the Novitas MAC published a Program Instruction on December 1, 2013, adopting a payment rule that Medicare providers would

---

[1] Yet as explained herein, no such additional clarity or details were actually added.

be reimbursed at 100% of the acquisition cost of radiopharmaceuticals, and therefore providers who billed for a higher amount than their acquisition costs were in violation of that Program Instruction. [*Id.* ¶¶ 75-79.]   Relators then provide examples of their own acquisition costs for one of the radiopharmaceuticals at issue – tetrofosmin (known as Myoview when sold by GE Healthcare); portions of proposed unexecuted contracts for tetrofosmin/Myoview offered to Relators in 2017 with proposed pricing for radiopharmaceuticals (the terms of which were intended to remain confidential); a 2017 Novation Pricing List; and some of Relators' invoices for tetrofosmin during 5 months between 2019 and 2023.  [*Id.* ¶¶ 82-106; Exhibits 5-14.]

Based solely on these examples of Relators' own costs in New Jersey, and prices offered to them in proposed 2017 contracts, Relators attempt to extrapolate this same pricing to all Defendants for all radiopharmaceuticals that Defendants acquired since December 1, 2013.  [*Id.* ¶¶ 107-122.] Relators purport to have compared that pricing to the CMS dataset that provides the "average Medicare payment amount" for "services" involving radiopharmaceuticals (based on the CPT code used) that Defendants billed to Medicare.  [*Id.* ¶ 118.] Without explaining the process used for making these comparisons or any additional basis for how the numbers on the Exhibit 1 spreadsheet were derived, the SAC concludes that all Defendants "actually billed Medicare much more than" the average amount, and submitted false claims by "misrepresent[ing] the dollar value at which they acquired sestamibi and tetrofosmin."  [*Id.* ¶¶ 122, 131.]  The SAC further assumes that Defendants "inserted false acquisition costs" on claim forms and submitted inflated invoices to Medicare for more than the acquisition cost of radiopharmaceuticals, in violation of the Novitas RP Program Instruction, thereby allegedly constituting both express and implied false certifications.  [*Id.* ¶¶ 132, 140, 149.]

Dr. Tripathi is a cardiologist currently practicing in Portland, Oregon, where he has been working since January 8, 2024.  Prior to that, he was employed at Jack Stephens Heart Institute, LLC in Arkansas, from July 15, 2022 through the end of 2023.  Before moving to Arkansas, Dr. Tripathi

was employed by Western Kentucky Heart & Lung Associates, PSC in Bowling Green, Kentucky, beginning his employment there on July 1, 2019, after completing residency.  Dr. Tripathi does not know the other Defendants in this case and is not aware of any association he has or may have had with any of them.

Dr. Tripathi brings the instant motion to dismiss the SAC with prejudice as to him under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state any valid claim against him at all, and under Rule 9(b) for failure to plead fraud with the requisite particularity.  For the reasons explained below, the SAC fails to meet the pleading standards required by Federal Rules 8, 9(b), and 12(b)(6), and amendment as to Dr. Tripathi[2] in these circumstances would be futile.  Therefore, the SAC's allegations against Dr. Tripathi should be dismissed with prejudice.

## LEGAL STANDARDS

### I.    Pleading Requirements under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757-58 (2014) (citation omitted).  "Plausibility requires more than a sheer possibility that a defendant has acted unlawfully." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Rather, plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  As explained further below, no such inference can be drawn against Dr. Tripathi from the SAC in this case.

---

[2] Dr. Tripathi does not know the other Defendants and cannot speak to the allegations against them.

Although for purposes of Rule 12(b)(6), the court accepts the factual contents of the complaint as true, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements" are not sufficient to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also United States ex rel. Conteh v. Ikon Office Sols., Inc.*, 27 F. Supp. 3d 80, 85 (D.D.C. 2014) (stating conclusory allegations "are not entitled to the assumption of truth") (citing *Twombly*, 550 U.S. at 679). A complaint "must offer more than labels and conclusions or formulaic recitation of the elements of a cause of action to provide grounds for entitlement to relief, and nudge the claims across the line from conceivable to plausible." *United States ex rel. Folliard v. Comstor Corp.*, 308 F. Supp. 3d 56, 68 (D.D.C. 2018) (cleaned up) (quoting *Twombly*, 550 U.S. at 555, 570). Likewise, legal conclusions "must be supported by factual allegations" to meet federal pleading standards. *Iqbal*, 556 U.S. at 679. A complaint cannot survive a motion to dismiss "if it tenders naked assertion[s] devoid of further factual enhancement." *Folliard*, 308 F. Supp. 3d at 68 (citing *Iqbal*, 556 U.S. at 678).

## II.    FCA claims must satisfy the pleading requirements of Rule 8(a) and Rule 9(b).

A motion to dismiss under Rule 12(b)(6) necessarily tests the sufficiency of whether the Complaint has met the standard of Rule 8, which similarly requires that "a complaint must allege sufficient facts, accepted as true, to state a claim plausible on its face." *United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 936 (D.C. Cir. 2017) (citing *Iqbal*, 556 U.S. at 678). Additionally, "because the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b)," as well as with Rules 8 and 12(b). *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002). The heightened pleading standard set out in Rule 9(b) additionally requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Therefore, FCA Relators "must satisfy the 'plausibility' pleading standard set forth in Federal Rule of Civil Procedure 8, as well as the heightened 'particularity' standard set forth in Rule 9(b)." *United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29, 38 (D.C. Cir. 2022)

(citation omitted); s*ee also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 n.6 (2016) (confirming FCA plaintiffs "must also plead their claims with plausibility and particularity" under Federal Rules 8 and 9(b)).

The "short and plain statement" requirement of Rule 8 does not abrogate or lower the requirements of particularity under Rule 9(b). Rather, when "read together, Rules 8 and 9(b) require a plaintiff to plead the time, place, and content of the fraud and to identify the individuals allegedly involved." *United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 936 (D.C. Cir. 2017) (citing *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C Cir. 2004)). The purpose of this heightened pleading standard is to "discourage[] the initiation of suits brought solely for their nuisance value, and safeguard[] potential defendants from frivolous accusations of moral turpitude, as well as guarantee all defendants sufficient information to allow for preparation of a response." *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015).

## III.  <u>Required Elements for a Valid FCA Claim</u>

The core concept of a FCA allegation is that a defendant knowingly made or caused a misrepresentation to induce the government to pay money that it should not have paid. Fundamentally, the "two essential elements of an FCA violation are (1) the falsity of the claim and (2) the defendant's knowledge of the claim's falsity." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 747 (2023). For pleading purposes, when combining Rules 8 and 9(b), courts within this Circuit require that in FCA cases the "'circumstances' that must be pleaded with specificity are matters such as the time, place, and contents of the *false* representations, such representations being the *element* of fraud about which [Rule 9(b)] is chiefly concerned." *Totten*, 286 F.3d at 551-52 (emphasis in original) (citation omitted); *see also Williams*, 389 F.3d at 1256. Conclusory allegations unsupported by specific factual content are insufficient to state a claim under the FCA. *Conteh*, 27 F. Supp. 3d at 85.

6

# **ARGUMENT**

Relators' SAC is long on names and conclusory allegations, but short on facts, despite already having been amended twice over the past seven (7) years. Not a single allegation put forth by Relators can reasonably support any FCA claim against Dr. Tripathi. The SAC alleges FCA violations under three theories: 1) presentation of false claims to the United States for payment under §3729(a)(1)(A) – a presentment claim; 2) making or using false records or statements to cause a claim to be paid under § 3729(a)(1)(B) – here, a false certification claim; and 3) knowingly and improperly retaining overpayments owed to Medicare under § 3729(a)(1)(G) – a so-called "reverse" false claim. Not only have Relators failed to sufficiently plead any of the elements of these claims against Dr. Tripathi, but the SAC's allegations also do not, and cannot, apply to him based on their plain language.

As a threshold matter, the SAC itself does not include any allegations specific to Dr. Tripathi. Dr. Tripathi's name appears only one time in the SAC's introductory list of Defendants. Even in the 156 pages of attachments, his name only appears in the SAC's Exhibit 1 spreadsheet. The only support for Relators' allegations against him must be inferred from the columns on that spreadsheet, which Relators assert "draws on" an annual dataset that is periodically released for Medicare Part B reimbursement claims and payments.[3] [SAC, ¶ 118.] As to Dr. Tripathi, the spreadsheet lists only his name, NPI number, and an Arkansas address; indicates that a certain number of claims for "Services" related to the code for sestamibi were submitted in 2019, 2020, 2021, and 2022; and then lists the amount of "Total" Medicare reimbursement supposedly paid in relation to those claims for those same years, but with no other information plausibly connecting those numbers to an FCA violation

---

[3] Relators assert the information in the Exhibit 1 spreadsheet "draws on" the annual dataset CMS releases [SAC, ¶ 118]; however, Relators have included no authenticating information demonstrating that any of these numbers, or which numbers, came from CMS, or when they were obtained, or how they were transferred into the spreadsheet; nor have Relators provided any other information corroborating the credibility of any of this data.

by Dr. Tripathi.  As noted above, Relators then assume, based on their own costs for a different radiopharmaceutical during different years, that any reimbursement over a certain average amount "must" prove a false claim was submitted.  The numbers on this spreadsheet – which we have only Relators' word for – are the sum total of Relators' so-called allegations against Dr. Tripathi.  And, these allegations are merely implied based on the numbers listed in columns created by Relators but are nowhere pled with the degree of particularity required by Rule 9(b).

       As further explained below, even assuming Relators' allegations are true, no facts regarding Dr. Tripathi have been plausibly alleged with sufficient detail to support the reasonable inference that Dr. Tripathi violated the FCA.  First, based on the nature of Relators' own allegations, their claims against Dr. Tripathi pertaining to Medicare billing between January 1, 2019 through July 14, 2022 either have already been fully adjudicated (strikingly, by these very same Relators), or are necessarily precluded by the face of the SAC, and must be dismissed as a matter of law.  Second, any allegations against Dr. Tripathi related to Medicare billing after July 14, 2022 also should be dismissed because Relators have failed to plead the "circumstances constituting fraud" with any particularity, or even plausibility, as to Dr. Tripathi.  Fed. R. Civ. P. 9(b); *see Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) ("A court should not "accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint.") (cleaned up).

**I.    Relators' allegations against Dr. Tripathi pertaining to claims submitted before July 15, 2022 cannot proceed as a matter of law.**

       The only allegations against Dr. Tripathi here (as implied by Exhibit 1 to the SAC but nowhere stated in the SAC itself) pertain to the billing of sestamibi during the years <u>2019 through 2022</u>.  *See* SAC, Exh. 1, p. 54.  However, any allegations regarding Dr. Tripathi's submission of Medicare claims during all but five months of that time period are facially deficient and require dismissal.

**A. The same Relators already have dismissed with prejudice all but five months of the claims they allege Dr. Tripathi fraudulently submitted.**

As a preliminary matter, the SAC's claims related to Dr. Tripathi's alleged billing of radiopharmaceuticals from 2019 through June 30, 2022 must be dismissed with prejudice as to Dr. Tripathi because any such claims have already been fully adjudicated in *United States ex rel. Jasjit Walia and Preet Randhawa v. Western Kentucky Heart & Lung Associates, PSC, et al*, No. 1:21-CV-126-GNS, in the Western District of Kentucky. Specifically, Dr. Tripathi's employer during the entirety of that time period – Western Kentucky Heart & Lung ("WKHL") – previously settled with <u>the same Relators here</u>, and based on the same allegations set forth in the SAC here, any FCA claims related to the billing of radiopharmaceuticals.[4] As a result, Relators entered a Joint Stipulation of Dismissal in that case, followed by an Order of the court, entered October 21, 2024, dismissing those claims with prejudice. Yet, boldly and unethically, Relators now seek to re-litigate their exact same claims against Dr. Tripathi, attempting to profit twice at his expense. Relators cannot collect a second time on claims they already settled, and that were dismissed with prejudice by express agreement between Relators, the United States, and the federal district court for the Western District of Kentucky.[5] Because of the foregoing, all of the SAC's claims against Dr. Tripathi that relate to the submission of Medicare claims for radiopharmaceuticals before July 15, 2022 are moot.

---

[4] Attached as Exhibit 1 is Dr. Tripathi's employment contract with WKHL (with redactions), which demonstrates the fact and dates of his employment, and that his employer was responsible for billing related to his cardiology services. A comparison of Dr. Tripathi's employment contract with the court record for the WKHL case further demonstrates that WKHL has already settled all related FCA claims that may have pertained to those services. Accordingly, the Court may consider this contract, in conjunction with the public record of the WKHL case noted herein, as integral to Relators' claims – i.e., together these facts demonstrate the mootness of the SAC's claims against Dr. Tripathi.

[5] *See* Docket Entries 50, 60, 65 and 66 in *United States ex rel. Jasjit Walia and Preet Randhawa v. Western Kentucky Heart & Lung Associates, PSC, et al*, No. 1:21-CV-126-GNS, in the Western District of Kentucky. As that case and relevant docket entries are public record, the Cour may take judicial notice of them. *See Green v. McHugh*, 793 F. Supp. 2d 346, 350 (D.D.C. 2011).

**B. Dr. Tripathi did not practice cardiology in a Novitas jurisdiction until July 15, 2022.**

Even if Relators had not previously agreed to dismiss all claims related to Dr. Tripathi's employer, the SAC here, on its face, further precludes any allegations against him while he was practicing in Kentucky. As the SAC plainly states, the entirety of Relators' allegations against Dr. Tripathi rest on the premise that all Defendants are "cardiologists practicing in Novitas jurisdictions," are subject to Novitas payment rules, and submitted inflated costs in violation of those rules. [SAC, ¶ 6.] Therefore, by its own terms, the entire premise of the SAC unravels as to Dr. Tripathi for any claims submitted to Medicare before July 15, 2022. Before that date, from July 1, 2019[6] through June 30, 2022, Dr. Tripathi was employed by WKHL, and any claims submitted for services provided by Dr. Tripathi between during that time necessarily were submitted in <u>Kentucky</u>. As is also plain from the SAC's face, Kentucky is <u>not</u> a Novitas jurisdiction, nor is it in the "east coast region," which the SAC's allegations are plainly limited to. [*See* SAC, ¶¶ 3, 76 (listing all Novitas jurisdictions.)] In fact, one of the few specific allegations in the SAC is that Relators are bringing this suit against Defendants who are "practicing in Arkansas, Colorado, Florida, Louisiana, Mississippi, New Mexico, Oklahoma, Texas, Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania and certain areas of Virginia." [*Id.*, ¶ 16.] Noticeably absent from that list is Kentucky, where Dr. Tripathi practiced during all but the last 5 months of the time period Relators allege is relevant to their allegations here. Therefore, Relators' allegations regarding any claims submitted for Dr. Tripathi's services in 2019 through June 30, 2022 are entirely negated based on the plain language of the SAC pertaining only to Novitas jurisdictions.

Attached in support are relevant portions of Dr. Tripathi's employment contracts with WKHL and his subsequent employer (Exhibits 1 and 2, exhibits excluded) signed by Dr. Tripathi, which are

---

[6] Prior to that date, Dr. Tripathi was completing his residency at Harvard Medical School.

submitted here for the sole purpose of demonstrating the mootness of Relators' claims against him, as Relators have defined their claims in the SAC. Although motions brought under Rule 12(b)(6) require courts to decide the matter on the pleadings alone, under the incorporation-by-reference doctrine courts may consider a document that is not attached to the complaint if it is "integral to the plaintiff's claim." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (citations omitted). "A document is 'integral' to the complaint if it forms the basis for a claim or part of a claim." *Horton v. Espinodola*, 319 F. Supp. 3d 395, 400 (D.D.C. 2018) (citing *Banneker Ventures*, 798 F.3d at 1133) (cleaned up).

Here, the "basis for" Relators' claim is that "all Defendants" were subject to Novitas payment rules when purchasing radiopharmaceuticals at "typical" pricing within Novitas jurisdictions, and they have limited their claims regarding Dr. Tripathi to the years 2019 – 2022 (based on the Exhibit 1 spreadsheet). Based on the SAC's plain language, these employment contracts therefore are integral to Relators' claims for two reasons. First, by showing where Dr. Tripathi practiced, they demonstrate that for the majority of the alleged relevant time period Dr. Tripathi does not fit Relators' own definition of who the "Defendants" are in this case. Second, they undermine the basis for Relators' allegations regarding the relevant time period, thereby demonstrating that none of the SAC's

11

allegations can apply to Dr. Tripathi before July 15, 2022.[7]  Accordingly, these contracts entirely negate all of the SAC's allegations against him before that date.[8]

## II.     Relators fail to sufficiently allege that Dr. Tripathi submitted any false claims to Medicare.

As explained above, based on the face of Relators' SAC and Exhibit 1 spreadsheet, as to Dr. Tripathi, the only claims to Medicare that could, at least in theory, be viable here are those related to reimbursement for sestamibi used by Dr. Tripathi between July 15 and December 31, 2022 (hereinafter, "the Arkansas claims").  Yet even for that time period, the SAC fails to meet Rule 9(b)'s standards as well.  To meet the heightened standard of Rule 9(b), FCA relators must at least allege "the who, what, when, and where with respect to the circumstances of an alleged fraud."  *United States ex rel. Winnon v. Lozano*, No. 17-2433-RJL, 2023 U.S. Dist. LEXIS 164900, at *11 (D.D.C. Sep. 15, 2023) (cleaned up) (citing *United States ex rel. Reidel v. Bos. Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 76 (D.D.C. 2018)); *see also Folliard*, 308 F. Supp. 3d at 68-69 (applying the same standard when characterizing a plaintiff's burden in an FCA case).

More specifically, Relators' presentment claim under § (a)(1)(A) of the FCA requires plausible allegations that "(1) the defendant submitted or caused to be submitted a claim to the government, (2)

---

[7] Relators also "necessarily rel[y]" on the address listed in the Exhibit 1 spreadsheet for their claim that Dr. Tripathi is a cardiologist practicing in a Novitas jurisdiction – an address that already was proven to be incorrect at least once here, by Relators' initial failure to serve Dr. Tripathi at his correct address.  *Walpin v. Corp. for Nat'l, & Cmty. Serv.*, 718 F. Supp. 2d 18, 21 (D.D.C. 2010) (finding courts "may consider" documents "upon which the plaintiff's complaint necessarily relies" even if attached to a motion to dismiss).  Documentation of some form demonstrating where he practiced during the period of time alleged by Relators is integral to challenging the basis for Relators' claims about the jurisdiction of Novitas payment rules.  Therefore, the Court may consider Exhibit 2, at least as to the dates and location of Dr. Tripathi's employment and practice in Kentucky and in Arkansas.

[8] Even if the Court converts the instant motion to one for summary judgment, Dr. Tripathi's argument here still would prevail – i.e., that the SAC's allegations by Relators' own definitions and assertions do not apply to him at least before July 15, 2022, and that summary judgment should be granted in his favor as to all Medicare claims at issue submitted before that date.

the claim was false, and (3) the defendant knew the claim was false." *Reidel*, 332 F. Supp. 3d at 65 (citations omitted). Similarly, Relators' false certification claim under § (a)(1)(B) "requires evidence that the defendant made a false *statement* to the government." *Shannon*, 2025 U.S. Dist. LEXIS 61006, at *18 (comparing §3729(a)(1)(A) to §3729(a)(1)(B)). In either case, however, "[i]t is axiomatic that a plaintiff bringing an action for fraud under the FCA must, first and foremost, allege that an actual 'false claim' was presented to the Government." *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 195 (D.D.C. 2011) (citation omitted). The SAC makes no such plausible allegations here.

### A. Dr. Tripathi was not purchasing radiopharmaceuticals nor submitting claims for their costs.

As an initial matter, because neither the SAC nor the Exhibit 1 spreadsheet have pled any allegations related to the Arkansas claims with the required particularity, it is impossible to tell how many claims could be at issue, if any even exist; whether or not any of them were inflated, or if so, by what amount; or what amounts of reimbursement may be tied to them. As further explained below, for that reason alone, Relators' allegations regarding those claims should be dismissed.

Yet even more importantly, and regardless of whether additional information had been or could be pled, Relators' FCA allegations still necessarily fail because for the entirety of the time period in question (July – December 2022), Dr. Tripathi was a full-time salaried employee of the Jack Stephens Heart Institute, LLC, in which he had no ownership interest. Pursuant to the terms of his employment contract, Dr. Tripathi was required to assign all claims related to his medical services to his employer. Specifically, Section 6 of his employment contract reads as follows:

> Employer shall perform all billing of patients and payors and shall pay all costs incident to billing and collections with respect to professional medical services rendered by Physician under this Agreement regardless of where such services are rendered. All fees or other income from any source attributable to the professional medical services rendered by Physician in the course of Physician's employment by Employer and related activities shall be the sole property of Employer, unless otherwise approved… and Physician assigns the same to Employer.

*See* Exh. 2, Section 6. As also stated in Section 3 of the contract, his employer furnished all needed

13

supplies, which included purchasing all radiopharmaceuticals, to employed physicians.  Exh. 2, p. 4.

The Court may additionally consider this contract as "integral to" Relators' claims because the SAC's claims are based on submitting inflated costs for radiopharmaceuticals. Thus, whether Dr. Tripathi was even in a position to purchase radiopharmaceuticals, bill Medicare for the cost of radiopharmaceuticals, or even have knowledge of their acquisition costs, "forms the basis for a claim or a part of a claim" – indeed the entirety of the claims here – in Relators' SAC.  *Banneker Ventures*, 798 F.3d at 1133 (noting the example of incorporating by reference "a legally operative document that is a necessary element of the claim" even when attached to a motion to dismiss) (citations omitted). Of critical importance to Relators' claims here, Dr. Tripathi could not have violated the FCA in the manner alleged because he did not submit or cause the submission of Medicare claims at all, let alone false claims.  He also did not purchase radiopharmaceuticals, nor did he have control over their pricing, nor did he control the amounts billed to Medicare for reimbursement of those costs.  Based on the terms of his contract, he could not have knowingly submitted or influenced any false claims. Therefore, even for the Arkansas claims, the SAC's allegations cannot apply to him.

**B.   Relators have not sufficiently alleged the "who, what, when, and where" with respect to Dr. Tripathi's involvement in submitting any false claims.**

Even apart from Dr. Tripathi's employment contract, Relators' allegations regarding the Arkansas claims – which are the only allegations that, at least in theory, have legal standing with regard to Dr. Tripathi – still fail to meet federal pleading standards.  Relators "must set forth an adequate factual basis for [their] allegations that [Dr. Tripathi] submitted false claims (or false statements in order to get false claims paid), including a detailed description of the specific falsehoods that are the basis for [the] suit." *Totten*, 286 F.3d at 552.  Yet all three Counts of the SAC should be dismissed as to Dr. Tripathi because Relators have not pled "with sufficient particularity the time, place and content of [Dr. Tripathi's] false misrepresentations," nor have Relators met their burden of alleging the basic

14

elements answering the questions of "who, what, when and where" with respect to Dr. Tripathi's alleged involvement in any fraudulent conduct. *Folliard*, 308 F. Supp. 3d at 68-69 (citations omitted).

    1.   <u>"Who" – The failure to allege Dr. Tripathi's role is fatal to Relators' claims.</u>

      As noted above, Relators "fail[] to identify with specificity who precisely was involved in the fraudulent activity." *United States ex rel. Bailey v. Veterans Med. Transcription Servs., Inc.*, 2024 U.S. App. LEXIS 29835, at *3 (D.C. Cir. Nov. 22, 2024) (citing *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004)). The SAC repeatedly makes accusations against all "Defendants" generally but contains no specific allegations against Dr. Tripathi at all, let alone his role in submitting false claims – a lack of specificity that does not satisfy Rule 9(b)'s requirements. *Bailey*, 2024 U.S. App. LEXIS 29835, at *2 (finding the failure to allege who actually "made which misrepresentations or who submitted which fraudulent claims to the United States" was fatal to an FCA complaint). *See Williams*, 389 F.3d at 1257.

      This is particularly fatal to the claims here because, as explained above, Dr. Tripathi's employer was legally responsible for the purchasing of radiopharmaceuticals, and all billing and coding related to any services he provided using the radiopharmaceuticals in question.[9] Relators' apparent assumptions in the Exhibit 1 spreadsheet based merely on the NPI number associated with certain services rendered by the treating provider are not sufficient to adequately allege who submitted the resulting claim for reimbursement or provided the information on that claim. Relators' failure to make specific allegations against individual Defendants prevented Relators from having to affirmatively

---

[9] This contract also is integral to Relators' claims because they are alleged only against Defendants who purchased radiopharmaceuticals and submitted claims to Medicare for their costs in doing so, yet the contract makes clear that Dr. Tripathi does not fit that definition of "Defendants." Based on the SAC's own language, it "necessarily relies" on information as to who purchased and billed for radiopharmaceuticals – i.e., the question of who is an appropriate Defendant is integral to any valid claim. *See Walpin,* 718 F. Supp. 2d at 21.

address Dr. Tripathi's employment status, and the critical impact that necessarily has on their claims against him.[10]

Even apart from his employment situation, Relators' attempted "group pleading" approach against multiple Defendants with no specific allegations regarding their individual roles also is insufficient to meet Rule 9(b)'s standards because "[i]t is insufficient to allege a scheme against one defendant and merely ascribe similar behavior to another." *United States ex rel. Bender v. N. Am. Telecomms., Inc.*, 750 F. Supp. 2d 1, 6 (D.D.C. 2010) (finding FCA complaint "must make specific allegations against each individual defendant rather than collective allegations against 'each of the above-named Defendants,' since one of the main rationales behind Rule 9(b)'s particularity requirement is to guarantee all defendants sufficient information to allow for preparation of a response.") (citations and internal quotation marks omitted). "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Bailey*, 2024 U.S. App. LEXIS 29835, at *22-23 (citation omitted).

Other courts within this circuit have dismissed FCA cases brought against multiple defendants at once, where the complaint takes a "shotgun approach" of "firing out [multiple] accusations at [multiple] defendants, hoping that some accusations stick on some defendants," because it "does not approach the specificity required by Rule 9(b)." *United States ex rel. Grynberg v. Alaska Pipeline Co.*, 1997 U.S. Dist. LEXIS 5221, at *13 (D.D.C. Mar. 27, 1997). In *Bailey*, the relators similarly submitted an exhibit of over 3,000 lines (similar to Relators' Exhibit 1 Spreadsheet) listing allegedly fraudulent contracts and asserting that the alleged fraud occurred in those "specifically identified" contracts

---

[10] Moreover, Relators' inclusion of Dr. Tripathi as a Defendant here at all further demonstrates that Relators failed to conduct even a negligible amount of investigation prior to filing the SAC.

described in the Exhibit. 2024 U.S. App. LEXIS 29835, at *3. The D.C. Circuit found this form of pleading did not satisfy the particularity requirement, especially since fewer than 10% of the listed contracts involved the particular individual defendant moving to dismiss. Because the SAC "alleges no facts about the acts of any of the individual [] Defendants," the Court is unable "to draw the reasonable inference that [Dr. Tripathi] is liable for the misconduct alleged." *Id.*, at *18 (collecting cases) (citation omitted); *see also Antoine v. U.S. Bank Nat'l Ass'n*, 547 F. Supp.2d 30, 37 (D.D.C. 2008) (explaining that plaintiffs bringing a fraud claim "must plead specific and separate allegations of fraud against [individual defendants] to succeed against … an individual defendant").

The court in *Williams* found such "imprecision not only failed to give the [defendants] sufficient information to answer the complaint, but it also subjected the named individuals to vague, potentially damaging accusations of fraud." *Williams*, 389 F.3d at 1257. Such is the case here as well – Dr. Tripathi's reputation has been called into question by his being named in Relators' SAC, but the vague and conclusory allegations against multiple defendants fail to identify how he allegedly made misrepresentations to Medicare, thereby leaving him "to perform the investigation and sort out [his] own involvement." *Grynberg*, 1997 U.S. Dist. LEXIS 5221, at *14.[11] "This is not a sufficient pleading, but is instead an attempt by plaintiff to shift his investigatory burden onto defendants." *Id.*; s*ee also Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (explaining that in cases involving multiple defendants "[i]t is particularly important … that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her.") (citations omitted).

---

[11] As the court in *Grynberg* noted, this kind of collective pleading is only appropriate on "rare occasions" where the defendants "are part of a concerted effort, such that they can be considered one collective unit." *Id.*, at *14-15, n.9.

2. <u>"What" – The SAC fails to allege "with particularity the circumstances" supporting the falsity element of an FCA claim against Dr. Tripathi.</u>

The SAC also fails to even plausibly, let alone particularly, allege any facts as to exactly "what" Dr. Tripathi did to violate the False Claims Act. *See Reidel*, 332 F. Supp. 3d at 77-78 (analyzing whether "the 'what' requirement of Rule 9(b) is satisfied" by considering whether the relator provided "a detailed identification of the scheme" under each theory of liability) (citing *Heath*, 791 F.3d at 124).

### a. *The SAC does not identify a single false claim submitted by Dr. Tripathi.*

Even accepting all the alleged facts as true, the SAC fails to plausibly allege any facts supporting a reasonable inference that Dr. Tripathi ever presented any false claim or made any false statement to Medicare. Critical to Relators' failure to meet the standard of Rule 9(b) is that the SAC, and its 156 pages of attachments, fail to identify a single false claim submitted to Medicare by <u>Dr. Tripathi</u>. The SAC is devoid of any actual or representative examples of any false representation made by Dr. Tripathi, such as a claim form with false information on it, or any comparison of invoices sent to Dr. Tripathi with reimbursement he received, or even any indication that Dr. Tripathi, as an employed physician who had assigned his right to bill for and receive reimbursements to his employer, would have submitted claims to Medicare, or been otherwise involved with billing. *See, e.g., United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358-59 (11th Cir. 2006) ("[Relator] fails to provide the next link in the FCA liability chain: showing that the defendants actually submitted reimbursement claims for the services [Relator] describes. Instead, [Relator] portrays the scheme and then summarily concludes that the Named Defendants submitted false claims to the Government for reimbursement.").

Relators also fail to allege any detail about the type or manner of false claims that allegedly were submitted. For instance, as Relators note, the claims at issue would, by federal rule, have required the submission of corresponding CMS 1500 claim forms, which would have included the reported costs of radiopharmaceuticals; but Relators and their spreadsheet wholly ignore the critical element of what other codes were reflected on the corresponding claim/s, and which portions of any

18

reimbursement were tied to which codes for which claims. For instance, although the SAC alleges that the A9500 claim for sestamibi was billed in relation to Dr. Tripathi's NPI number, by Relators' own admission, sestamibi was used in diagnostic studies (nuclear stress tests) [SAC, ¶ 2], and therefore any related claim for the <u>cost</u> of sestamibi necessarily would also have generated an additional CPT code and corresponding claim for the cardiologist's professional fee related to performing the <u>test</u> itself (since sestamibi is an item not a service). The 1500 claim form by its nature is tied to the patient encounter. For the claims Relators place at issue here, there likely would be at least two codes (and corresponding claim lines) submitted with each, but also could include any other diagnostic test that also was performed on the same patient that same day.

The CMS 1500 form is the evidence of the claim or claims submitted for that specific patient encounter. It is not only common but typical for there to be multiple claim lines on each 1500 form, as demonstrated by the sample form attached to the SAC as Relators' Exhibit 15. Yet Relators' Exhibit 1 spreadsheet lacks any specifics differentiating the claims submitted, or the corresponding reimbursement in any way. And, Relators have provided no examples of any forms, let alone examples with Dr. Tripathi's NPI.[12] Relators here have not distinguished in any way, or provided credible allegations supporting, that the alleged payment amounts relate only to the purchase of the radioisotope. In short, without the 1500 claim form associated with the claim that was false, it is impossible to know what, if any, claim to Medicare was false, and if so in what amount.

Likewise, Relators' Exhibit 1 spreadsheet also does not distinguish which amounts of reimbursement were for the cost of sestamibi and which amounts were for the services performed in which sestamibi was used. The column purporting to be "Total Medicare Reimbursement" also does

---

[12] By Relators' own admission, the form which Defendants would have submitted to Medicare for these radioisotopes is the 1500 form, but the only example Relators includes is completely blank, widely available on the Internet, and therefore not exemplary in any way. It also does not reference Dr. Tripathi, or notably any Defendant, at all. *See* SAC, Exhibit 15.

not explain what the amounts listed are tied to – if only tied to Dr. Triptahi's NPI, then the listed amount will necessarily include the professional service fee, which is legitimate, and also the legitimate acquisition costs, as well as any additional billable services for that patient encounter. There are no allegations to support a reasonable inference that the amounts listed on the spreadsheet were improperly obtained. This lack of particularity thus prevents Dr. Tripathi from justifying whether the relevant 1500 claim forms included claims for additional services provided on a particular day to a particular patient. *See, e.g., Winnon*, 2023 U.S. Dist. LEXIS 164900, at *22 (noting the lack of particularity prevented defendants from justifying medical necessity of certain codes "for particular patients on certain dates"). Relators ask the Court to simply adopt their financial analysis without a shred of evidence to support the same, or to tie such evidence to illicit conduct by Dr. Tripathi.

In short, Relators have failed to adjudicate a single claim that they allege is false. For example, the SAC fails to provide this Court with: 1) even one relevant 1500 claim form evidencing the particular CPT code or codes claimed and submitted to Novitas, 2) the corresponding amounts of reimbursement specific to that 1500 claim, and 3) the acquisition costs for the radiopharmaceutical used in reference to the service rendered as referenced by that same 1500 claim. Without at least those three elements, Relators have no formula upon which to allege the submission of a false claim at all, let alone one submitted by Dr. Tripathi. *United States ex rel. Digital Healthcare, Inc. v. Affiliated Comput. Servs.*, 778 F. Supp. 2d 37, 53 (D.D.C. 2011) ("[A] relator must provide details that identify particular false claims for payment that were submitted to the government.") (citation omitted). And, Relators cannot show any such claims submitted by Dr. Tripathi because, according to his employment agreement, there are none – his employer handled the purchasing of and billing for the sestamibi used in the tests he performed.

Therefore, without allegations of any specific details regarding Dr. Tripathi's own conduct, such that one could reasonably infer how he submitted or caused the submission of a false claim, it is

impossible for Dr. Tripathi to defend the information that was submitted on any particular claim to Medicare, and also to ascertain any amount of alleged damages to Medicare resulting from any particular false claim.  *See United States ex rel. Digital Healthcare, Inc.,* 778 at 37 (D.D.C. 2011) (dismissing relator's complaint for making "broad allegations [that] do not specify any representative claims from among the tens of thousands [alleged to be fraudulent], which would obviously be critical in providing [Defendant] sufficient information to allow for preparation of a response.") (citations omitted).

### b.  The SAC fails to allege specific details of a fraudulent scheme paired with reliable indications that Dr. Tripathi submitted any false claim.

Even where private relators lack documentary evidence showing "the precise details of individual claims" submitted, more than mere assumptions is still required.  *Heath*, 791 F.3d at 126 (collecting cases).  Where no examples of a false claim are submitted or described specifically, the "central question . . . is whether the complaint alleges '*particular details* of a scheme to submit false claims *paired with reliable indicia* that lead to a *strong* inference that claims were actually submitted.'" *Heath*, 791 F.3d at 126 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)) (emphasis added).  No such "particular details" or "reliable indicia" are alleged in the SAC with regard to Dr. Tripathi.

Instead, Relators ask the Court to accept a number of unsupported, and unreasonable, assumptions.  For instance, the SAC makes the conclusory and illogical assumption that the pricing arrangements for radiopharmaceuticals remained constant for all types of cardiology providers throughout "the entire east coast region" from 2013 to the present.  No reasonable basis for such an assumption is provided.[13]  Relators wrongfully attempt to extrapolate their own pricing agreements, primarily for tetrofosmin, to all claims for radiopharmaceuticals submitted by all Defendants, in an

---

[13] Indeed, it is difficult to think of any product in the United States that has not changed in price since 2013.

attempt to convince the Court that standard pricing for radiopharmaceuticals exists. Relators also assume, without any supporting data, that all Defendants had the same contracts with the same distributors under the same terms as Relators throughout the entire ten-plus-year period. They further assume every Defendant's purchasing volume for these radiopharmaceuticals remained consistent over 10-plus years, such that it would not affect pricing or other contractual terms.

Relators provide no logical basis for asking the Court to accept these assumptions. Notably, although the entire premise of the alleged scheme is based on Relators' own contracts and purchasing history, Relators include no details regarding what kind of health care entity they own or work for, the nature of their cardiology practice, the volume of radiopharmaceuticals they typically used in any given year, or their delivery costs. They also have not alleged anything about the size of their own practice or the history of their purchasing volume. Common sense alone would suggest that the pricing of radiopharmaceuticals must vary based on such factors, and likely changed from year to year based on supply and demand, and other market factors, all of which the SAC is completely silent about. Mere assumptions based solely on Relators' own cost experiences and contractual pricing arrangements do not constitute "a level of detail that demonstrates that an alleged scheme likely resulted in bills submitted for government payment." *Winnon*, 2023 U.S. Dist. LEXIS 164900, at \*15. The falsity element here, therefore, rests on nothing more than conclusory and unsupported assumptions that do not meet the standard set forth in *Heath* or *Williams* discussed above.

Critically, for Relators' claims against Dr. Tripathi, the other missing piece to the falsity element here is any plausible allegation about the actual cost of the sestamibi related to Dr. Tripathi's services provided between July 15 and December 31, 2022. Relators reference a handful of their own invoices related to their purchases of tetrofosmin in New Jersey and their own contracts in 2017, but provide no credible explanation for how any of those documents would relevantly relate to the cost of sestamibi in Arkansas during the latter months of 2022. Nevertheless, based only on their own

22

purchasing experiences and belief about "typical" prices and "most" radiopharmaceuticals, Relators attempt to create an artificial ceiling of "$100 per 30mCi dose," which Relators claim is far higher than average of any prices they themselves have paid for radiopharmaceuticals. [*Id.*, ¶ 82.] Relators attempt to use their Exhibit 1 Spreadsheet to further speculate that if any Defendant purportedly received an <u>average</u> Medicare reimbursement per claim for radiopharmaceuticals in a given year that was ever higher than $100/claim, it *must* be evidence that Defendant submitted false claims (in an unidentified number and amount) to Medicare.[14]  [*Id.* ¶¶ 111-116.]

Even taking all Relators' allegations as true, these assumptions amount to nothing more than speculation that Dr. Tripathi submitted false claims.  First, none of these assumptions apply to Dr Tripathi because under the terms of his employment agreement he was not involved in the purchasing of radiopharmaceuticals, nor was he responsible for billing Medicare for their costs.  *See* Exhibit 2, Section 3.1.  He also did not receive any reimbursement for their costs, because as a condition of employment he assigned his claims to his employer.  Because the falsity element of Relators' FCA claims is entirely based on their unsupported assumptions about pricing and purchasing, their claims here do not apply to Dr. Tripathi, nor could they be adequately alleged against him.

Nevertheless, even if this were not the case, Relators' assumptions about pricing still fail to allege with particularity any indication of a broader fraudulent scheme that Dr. Tripathi engaged in to submit or cause his employer to submit false claims.  Relators' claim to "have investigated RP prices in other areas of the country and have found that sestamibi and tetrofosmin are available nationwide at prices far below $100" also does not provide "reliable indicia" that Dr. Tripathi was part of a

---

[14] As explained above, any assumptions based on the Exhibit 1 spreadsheet are fatally flawed for several other reasons as well, such as the lack of credible support for the mathematical accuracy of the purported "averages," the lack of differentiation between what reimbursement amounts in any given year are tied to any particular claim, and also what amounts within the purported "Total" amounts were for legitimate acquisition costs or other services.

fraudulent scheme to inflate costs for sestamibi. [*Id.*, ¶ 108.] Relators never explain how or when they "investigated" these prices, nor do they address whether or how their "investigation" factored in distinctions among Defendants such as location, practice size, purchasing volume, delivery fees, or other market variables.

Likewise, Relators' recollection of a comment allegedly made by an unidentified "GE salesperson" who purportedly "advised" that the pricing GE offered to Relators in 2017 "is in a competitive range in the marketplace" is wholly unreliable to support Relators' wild speculations as to pricing offered to other Defendants. Notably, there is no indication that this salesperson has any knowledge of the prices of sestamibi in Arkansas in 2022. There also is no explanation of how the terms "competitive range" or "the marketplace" were defined. Moreover, Relators do not include an affidavit from this unnamed salesperson, or from any witness. No other context is provided (other than implying the salesperson was engaged in marketing to convince Relators to sign a proposed contract in 2017), nor is any other indicia of reliability included.[15] [*Id.*, ¶¶ 91-92.]

Relators' attempt to rely on pricing "averages" is equally deficient in supporting any inference of fraudulent conduct with respect to Dr. Tripathi. As this Court has previously observed, Relators cannot simply rely on statistical averages or "on mathematical probability to conclude that the [defendant] surely must have submitted a false claim at some point." *Winnon*, at *19 (quoting *Carrel v. AIDS Healthcare Found.*, 898 F.3d 1267, 1277 (11th Cir. 2018)). "[U]nder Rule 9(b), reliance on statistical or mathematical probabilities alone does not meet the heightened particularity requirements"

---

[15] Far from implying that all cardiologists necessarily paid the same prices, the context described by Relators suggests that negotiation regarding prices took place, implying that the prices "offered" to Relators were not the only option. Moreover, a salesperson involved in negotiating a contract often communicates in a manner designed to convince another party to accept the salesperson's offer, which makes it even less reasonable to blindly rely upon such assertions about non-public prices and then extrapolate as to pricing offered to other providers in other states in other time periods with different contracts.

for pleading "particular details" of a fraudulent scheme "paired with reliable indicia" of false claims submission. *Id.*, at *18-19 (collecting cases). The relators in *Winnon* attempted to rely on comparing statistical nationwide averages of certain codes between the defendant skilled nursing facilities and other similar facilities nationwide to support their upcoding allegations, but *without also pleading* the "particular details" required by the standard expressed in *Heath*, such reliance on national averages does not meet Rule 9(b)'s pleading standard. *Id.*

The SAC's assumptions here do not even rise to the level of statistical data or mathematical probability. Unlike in *Winnon*, no official reports of nationwide, or "east coast," averages have been provided. The purported averages, "typical" costs, and the artificial standard of less than $100 per dose all are based on Relators' <u>own</u> limited experiences, not on actual statistical data, or statistical sampling, that could reasonably be extrapolated to hundreds of diverse and unconnected defendants. And, they certainly cannot be relied upon as a substitute for the "reliable indicia" of Dr. Tripathi's allegedly fraudulent conduct that is fatally absent from the SAC.

For similar reasons, none of the Exhibits attached to the SAC cure Relators' pleading deficiencies either. Except for Exhibit 1, none of them even mention Dr. Tripathi at all. As noted above, assumptions based on the Exhibit 1 spreadsheet are fatally flawed for many reasons, including misleading labels that do not differentiate between claims for cost and claims for services (e.g. a column titled simply "# Services" though a radiopharmaceutical is not a service). Additionally, the only CPT code identified in connection with Dr. Tripathi's NPI, according to Relators, pertains to <u>sestamibi</u>, but nearly all of Relators' assertions regarding pricing relate to tetrofosmin/Myoview. Relators' misplaced reliance on the spreadsheet also prevents them from supporting a viable claim for damages. As noted above, the purported reimbursement amounts to do not distinguish what amount Medicare reimbursed Dr. Tripathi for each claim. And, although the spreadsheet purports to include an "average" amount that Medicare paid per claim, Relators do not reasonably dispute that billing for

25

acquisition costs is legitimate, which, presumably are also included in the total amounts listed. Without knowing what those costs were, the amounts claimed in relation to those costs, and the amount paid by Medicare for any particular claim, it is impossible to calculate the amount of alleged damages, and the amounts claimed by Relators in the spreadsheet are purely hypothetical.

As for the other Exhibits to the SAC, Relators fail to allege how any of them are at all relevant to Dr. Tripathi, or to the cost of sestamibi in Arkansas between July 15 and December 31, 2022. Although Exhibits 2-3 are purportedly the relevant payment rules for Novitas jurisdictions, they are entirely irrelevant to the time period when Dr. Tripathi worked in Kentucky; and, they are from 2017, which is long before the time Dr. Tripathi practiced in Arkansas. Exhibits 5, and 10-14 are all Relators' own invoices for tetrofosmin/Myoview, not for sestamibi, and do not pertain to Dr. Tripathi at all. Exhibits 6-9 are proposed contracts and pricing terms offered to Relators, and again are primarily related to tetrofosmin. These Exhibits are further fatally flawed because 1) they are from 2017 in New Jersey, and 2) they are Relators' own contracts – the SAC's allegations do not support any reasonable inference that Dr. Tripathi or his employer in Arkansas purchased sestamibi under the same contract in 2022. Finally, Exhibit 15 is a blank CMS 1500 form that does not support any allegation against Dr. Tripathi whatsoever.

Again, Relators merely seek to extrapolate their own pricing and contractual relationships to Dr. Tripathi, who, as an employee, would not have been a party to any similar contracts and had no legal authority to enter into any such contracts for radiopharmaceuticals. And, regardless of any employment arrangement, Relators still have not alleged a factual basis for projecting their own acquisition costs onto Dr. Tripathi. It is entirely speculative to allege that Dr. Tripathi submitted claims for inflated reimbursement amounts without specific, and basic, allegations about what the relevant acquisition costs were, and what amounts were actually billed to Medicare in comparison. Neither Relators' own experiences regarding acquisition costs, nor Relators' own unsubstantiated

beliefs regarding the pricing of radiopharmaceuticals across the entire "east coast region," are sufficient to constitute particular details of a fraudulent scheme or "reliable" indications that Dr. Tripathi submitted any false claims.

       3.     <u>The SAC fails to allege the "where" and "when" aspects of the falsity element.</u>

Relators allege that Dr. Tripathi's allegedly fraudulent conduct occurred in Arkansas (as implied from the Exhibit 1 spreadsheet since the SAC itself only alleges that all Defendants committed fraud in "Novitas jurisdictions"). Based on their allegations regarding location, and for all the reasons explained above, Relators have themselves limited their allegations against Dr. Tripathi to, at most, claims submitted for sestamibi costs between July 15 - December 31, 2022.

Even this alleged time frame, however, is not pled with sufficient particularity for Rule 9(b) purposes. For one thing, the Exhibit 1 spreadsheet lists only years in a single column with no other differentiation as to timing, nor do those years distinguish between the timing of submitting a claim to Medicare and the time when reimbursement was paid by Medicare. This lack of specificity is fatal to the Arkansas claims because they were only submitted during the last few months of the year "2022." For 2022, Relators allege nothing about the dates of service for which claims were submitted for services provided in Kentucky as opposed to those provided in Arkansas. Relators allege nothing about the timing between submission of a claim to Medicare and payment of that claim. Because many of the claims submitted for Dr. Tripathi's services in Kentucky during the first six months of 2022 likely were not paid by Medicare until after he began working in Arkansas, the reimbursement received for those claims in Kentucky must, at the least, be subtracted from the column in the spreadsheet listing "Total" Medicare reimbursement for that year. Without any specificity regarding the dates of service for the claims that are allegedly false, it is impossible for Relators to properly allege a claim for any amount of damages.

It is also impossible to ascertain from the Exhibit 1 spreadsheet the number of claims allegedly submitted during the relevant months of 2022, and it is equally impossible to ascertain the "average" reimbursement or the total reimbursements that are allegedly tied to those Arkansas claims. This lack of specificity as to dates also completely undermines Relators' assumptions about the average amounts of reimbursement per claim in 2022; and because the alleged "averages" on the spreadsheet were Relators' only basis for assuming falsity, the lack of reliability as to the amounts of reimbursement for Dr. Tripathi's services in 2022 entirely negates Relators' FCA claims against him. The lack of particularity here also prevents Dr. Tripathi from adequately responding to such vague allegations. *See United States ex rel. Tudbury v. Pac. Architects & Eng'rs (PAE), Inc.*, 270 F. Supp. 3d 146, 152-53 (D.D.C. 2017) (noting that especially "when a scheme spans several years, defendants must be able to defend against the charge and not just deny that they have done anything wrong") (quoting *Williams*, 389 F.3d at 1259). In short, Relators cannot credibly allege any amount of inflated claims or overpayments paid by Medicare, based on the imprecise numbers in the Exhibit 1 spreadsheet alone.

The vague allegations about timing and location also are further evidence that Relators failed to exercise a reasonable investigation before filing their claims as to Dr. Tripathi. As noted above, they clearly did not take appropriate steps to find out where Dr. Tripathi was practicing cardiology during the years listed in the Spreadsheet. They list his Arkansas address with no differentiation as to time periods, let alone individual claims, surmising without any discernible basis that Arkansas was the only state he practiced in during a 4-year time period.

### 4. The SAC's lack of specificity prevents Dr. Tripathi from adequately responding.

Relators' "failure to make allegations which satisfy the particularity requirements of Rule 9(b) inhibits [Dr. Tripathi's] ability to prepare an adequate response." *Winnon*, 2023 U.S. Dist. LEXIS 164900, at *22; *see also Heath*, 791 F.3d at 125 ("the point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and

28

to warrant further judicial process."). For instance, the lack of specificity as to the timing – and the related failure to differentiate between when allegedly false claims were submitted and when they were paid by Medicare – now require him to have to respond to allegations involving two different time periods that may not even be relevant to Relators' claims. This is nothing more than an attempt by Relators to "shift their investigatory burden" onto Dr. Tripathi, and a textbook example of what Rule 9(b) standards were designed to avoid. *Grynberg*, 1997 U.S. Dist. LEXIS 5221, at *14. Moreover, Relators' failure to conduct basic due diligence as to the accuracy of their allegations needlessly sullies Dr. Tripathi's professional integrity and harms his reputation. *See Grynberg*, 1997 U.S. Dist. LEXIS 5221, at *11 ("The purpose of [Rule 9(b)'s particularity] requirement is … to prevent a plaintiff from sullying the reputation of a defendant with baseless allegations…").

The FCA "provides for a defendant's recovery of reasonable attorneys' fees if the relator's claim is 'clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.'" *United States ex rel. Burke v. Record Press, Inc.*, 816 F.3d 878, 882 (D.C. Cir. 2016) (quoting 31 U.S.C. § 3730(d)(4)). The SAC's unreasonable assumptions as to Dr. Tripathi's alleged conduct do not provide any assurance, or even possibility, that any evidence will be eventually produced to support them, and thereby further support a claim for attorneys' fees in this case. *See United States ex rel. J. Cooper & Assocs. v. Bernard Hodes Grp., Inc.*, 422 F. Supp. 2d 255, 238 (D.D.C. 2006) ("A claim is frivolous if it is utterly lacking in legal merit and evidentiary support.") (citations omitted).

**C. The SAC contains no specific allegations supporting a false certification claim.**

Count II of the SAC is nothing more than an assumption based on the other assumptions discussed above regarding the pricing of radiopharmaceuticals and the submission of inflated claims to Medicare. For all the reasons explained above, Relators have not adequately alleged facts supporting that Dr. Tripathi submitted any false claims or made any false representations to Medicare. Thus,

29

because the SAC insufficiently pleads the element of falsity, Relators' contingent allegations regarding a false certification claim in Count II also are inadequate and should be dismissed.

### D.    Relators fail to allege the scienter element of any FCA claim against Dr. Tripathi.

Critical to any FCA analysis is also the required element of "knowingly."  *SuperValu Inc.*, 598 U.S. at 743 ("What matters for an FCA case is whether the defendant knew the claim was false."). The FCA defines "knowingly" as including three different mental states, which courts have consistently summarized as requiring a showing that "a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false." *Id.* at 750 (citations omitted); 31 U.S.C. § 3729(b)(1)(A) (i)-(iii).  Notably, the Supreme Court has affirmed that "strict enforcement" of the FCA's scienter requirement is needed to mitigate "concerns about fair notice and open-ended liability," and that therefore the requirement is "rigorous."  *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (citation omitted); *see also United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1270-71 (D.C. Cir. 2010) (reiterating that "strict enforcement" of the scienter requirement "help[s] to ensure that ordinary breaches of contract are not converted into FCA liability.").

Here, the SAC does not allege, nor can Relators support, a claim that Dr. Tripathi was even in a position to have knowingly or influenced any false claims.  The SAC's allegations are, effectively, made against defendants who submitted inflated claims for radiopharmaceuticals, an offense which necessarily requires knowledge of what the acquisition cost of the particular radiopharmaceutical was at the time, and then knowingly inflated that cost.  Notably, because Relators have not sufficiently alleged the falsity element, Relators effectively cannot allege scienter with the requisite particularity either, and dismissal of Dr. Tripathi from this case is appropriate.

Nevertheless, even if Relators' assumptions regarding falsity could somehow constitute allegations of a fraudulent scheme involving Dr. Tripathi, there are no allegations at all in the SAC

that could support any of the three kinds of requisite knowledge to constitute an FCA violation. Based on the SAC's own logic, Dr. Tripathi could not have actual knowledge of submitting a claim for inflated acquisition costs of sestamibi unless he knew what the actual costs were at the time. Yet Relators have provided nothing indicating that <u>Relators</u> even know what the costs of sestamibi were in Arkansas in 2022, let alone that Dr. Tripathi ever did. And, as explained above, because Dr. Tripathi's employer was responsible for purchasing sestamibi, it is not reasonable to infer, without more, that Dr. Tripathi knew what those costs were. Because Dr. Tripathi's employer also was responsible for billing Medicare for reimbursement of those costs, and had the right to retain the payments received, there also is no basis provided in the SAC for assuming that Dr. Tripathi would have known if his employer were fraudulently inflating those costs. Even apart from his employment situation, though, Relators have not plausibly alleged any facts leading to a reasonable inference that Dr. Tripathi had any knowledge of or control over acquisition costs for sestamibi, nor that he had any knowledge or control over the amounts billed to Medicare related to those costs.

Certainly, actual knowledge of submitting claims for inflated costs on the part of Dr. Tripathi has not been plausibly alleged. But "deliberate ignorance" also cannot apply here as the SAC similarly provides no basis for inferring that Dr. Tripathi made any representations without believing their truth, or that he made a false statement while "shut[ting] his eyes to the facts, or purposely abstained from inquiring into them." *SuperValu Inc.*, 598 U.S. at 750 (citations omitted). Relators do not allege that Dr. Tripathi was on notice of any fraudulent behavior, or that, as an employee, he would have been in a position to inquire further into his employer's billing practices. The SAC also is devoid of factual allegations that could support any inference that Dr. Tripathi acted with reckless disregard for whether he was involved in fraudulent conduct. Reckless disregard may apply to "defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims

31

anyway." *SuperValu Inc.*, 598 U.S. at 751.  Yet again, the SAC does not allege any facts supporting such an inference here.

Moreover, "[t]he FCA's scienter element refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *SuperValu Inc.*, 598 U.S. at 749.  Nothing in the SAC plausibly alleges that Dr. Tripathi subjectively believed or should have known that false claims, if any, were being submitted.  Even then, most courts generally do not consider "mere knowledge of a fraud" to be sufficient for FCA liability, and require that the defendant "affirmatively act" in some way to further the unlawful objective.  *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 50 (D.D.C. 2014).  Relators, however, also have not alleged that Dr. Tripathi knew of any unlawful scheme on the part of his employer and then affirmatively acted in any way to further that scheme.

## III.  The SAC fails to sufficiently allege that Dr. Tripathi violated the reverse false claims provision.

Relators also prospectively allege in Count III that Defendants "who do not return all overpayments" based on the SAC's allegations "within 60 days of receiving" the SAC will have violated § 3729(a)(1)(G) of the FCA.  [SAC, ¶ 160.]  Not only does this allegation fail to plead the required elements for liability under § 3729(a)(1)(G), but it also entirely misconstrues the meaning and application of this subsection.

Commonly known as the "reverse false claim" provision, subsection (a)(1)(G) of the FCA imposes liability for "knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an *obligation* to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) (emphasis added).  In practical terms, "a typical reverse false claim action involves a defendant knowingly making a false statement in order to avoid having to pay the government when payment is otherwise due.  *Reidel*, 332 F. Supp. 3d at 82 (citation omitted).  The FCA, as amended in 2009, defines "obligation" as "an *established* duty, whether or not fixed, arising from an express or implied contractual

32

… relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3)) (emphasis added). The term "overpayment" was further defined by the Patient Protection and Affordable Care Act ("ACA") as "any funds that a person receives or retains under [Medicare] or [Medicaid] to which the person, *after applicable reconciliation*, is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B) (emphasis added); *see also* 42 C.F.R. § 401.303(b) (defining "overpayments" as an amount identified "after applicable reconciliation").

An FCA claim under § 3729(a)(1)(G) therefore depends on an "established duty" to return an overpayment, which in turn depends on identifying the existence of an overpayment. *See, e.g., United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1231 (10th Cir. 2017) (explaining the word "established" in the FCA requires "an *existing* legal obligation to pay or transmit money" that "arises from some independent legal duty.") (emphasis added). Therefore, the duty to pay "must be formally established before [FCA] liability can arise… In other words, there is no liability for obligations to pay that are merely potential or contingent," as they are not "established." *Barrick*, 878 F.3d at 1231 (citations omitted). Relators' action of filing a lawsuit is not sufficient to allege that any such duty has been "established," as that term is used in the FCA or ACA. Because Relators have not even plausibly alleged, let alone demonstrated, that Dr. Tripathi submitted any false claim, no overpayment or the duty to return one has been established.[16] *See Winnon*, 2023 U.S. Dist. LEXIS 164900, at *25 (dismissing reverse false claim allegations that "fail to specify the parameters of [the alleged] obligation, such as what triggers the duty to repay and what sort of repayment it requires.") (quoting *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 96-97 (D.D.C. 2014)).

---

[16] Relators also have not sufficiently alleged that Dr. Tripathi, as an employed physician whose employer had the sole right to receive and retain all reimbursement for his services, could have received or, importantly here, retained any overpayment from Medicare anyway.

## IV.  **Relators have not met the standard for joinder under Rule 20(a).**

Dr. Tripathi also should be dismissed from this action based on improper joinder.  Relators have joined over 530 defendants in this case, but have not sufficiently alleged any facts with respect to Dr. Tripathi that would satisfy the two-part test required for them to do so under Rule 20(a).  First, to properly join Dr. Tripathi to the other Defendants, the SAC must either assert that he is jointly and severally liable with all other Defendants for the requested relief, or that the case against him arises "out of the same transaction, occurrence, or series of transactions or occurrences."  Fed. R. Civ. P. 20(a)(2)(A).  Second, the SAC also must assert that questions of law or fact will arise in this action that are "common to all defendants."  Fed. R. Civ. P. 20(a)(2)(B).  Relators here have not properly alleged either of these prongs.

To satisfy the first requirement, Relators "cannot join defendants who simply engaged in similar types of behavior, but who are otherwise unrelated; *some allegation of concerted action between defendants is required.*"  *Spaeth v. Mich. State Univ. College of Law*, 845 F. Supp. 2d 48, 53 (D.D.C. 2012) (quoting *Grynberg*, 1997 U.S. Dist. LEXIS 5221, at *4) (emphasis in original)).  Relators here, however, have alleged nothing about joint and several liability, nor does the SAC even suggest that Dr. Tripathi is in any way connected to the other named Defendants.  Although Relators make similar allegations against all Defendants, "it is not enough for [Relators] to allege that each defendant violated the False Claims Act or even that each violated the FCA in a similar manner."  *Grynberg*, 1997 U.S. Dist. LEXIS 5221, at *6 (finding FCA complaint fails to satisfy Rule 20(a) when it "merely alleges that defendants committed similar actions at different times and different places, and submitted distinct and separate false statements on different contracts," but did not act "in concert" with one another).

For claims to arise "out of the same transaction, occurrence, or series of transactions or occurrences," they must be "logically related," which in turn typically requires allegations "of concert or conspiracy."  *Spaeth*, 845 F. Supp. 2d at 53 (citations omitted) (finding that although the claims

34

arose under the same statute, plaintiff "offered nothing to suggest that the claims are logically related in any way" by alleging that defendants conspired together or "acted pursuant to a shared policy" or took any other "concerted action"). The only facts in common alleged by the SAC here are that "all Defendants" are cardiologists, they "all" practice in a Novitas jurisdiction, and they "all" overbilled Medicare for radiopharmaceuticals. Yet as in *Grynberg*, the SAC "does not present any evidence or allegation of conspiracy or concerted action." 1997 U.S. Dist. LEXIS 5221, at *7 (observing that "[o]ther courts have refused to permit joinder of parties who engaged in similar types of activity, but who were not in concert with one another") (collecting cases).

Relators have not established the second prong either. "[T]he fact that [Relators'] claims are premised on the same legal theory is insufficient for showing that they raise common questions of law or fact." *Spaeth*, 845 F. Supp. 2d at 54 (quoting Fed. R. Civ. P. 20(a)(2)(B)). The SAC's allegation that all Defendants inflated their cost of radiopharmaceuticals is so broad that it does not account for the many variations in the individual Defendants' prices, location, practice size, contractual agreements, or billing, all of which affect the commonality of the issues here, and ask the Court to make an unreasonable leap in assuming commonality where none is specifically alleged.

## V.  **As related to Dr. Tripathi, Relators should not be permitted to amend their complaint again.**

Although leave to amend complaints is granted "when justice so requires," Fed R. Civ. P. 15(a)(2), leave to amend may be denied for reasons of "undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by previous amendments, or futility of amendment." *Firestone v. Firestone*, 76 F.3d 1205, 1208, (D.C. Cir. 1996) (citation omitted). An amendment is futile if it would not survive a motion to dismiss under Rule 12(b)(6). *Singletary v. Howard Univ.*, 939 F.3d 287, 295 (D.C. Cir. 2019). "When an amendment would be futile, a district court may dismiss a case with prejudice for failure to state a claim." *Bailey*, 2024 U.S. App. LEXIS 29835, at *3-4 (quoting *Givens v. Bowser*, 111 F.4th 117, 123 (D.C. Cir. 2024) (internal quotation marks omitted)). Although it is within

the Court's discretion to allow Relators additional amendments, leave to amend also is not warranted where plaintiffs already have had multiple opportunities to plead their case and further amendment would be futile or cause undue delay. *See Atchinson v. District of Columbia*, 73 F.3d 418, 426 (D.C. Cir. 1996) (citations omitted).

In this case, Relators already have had two opportunities to plead a viable claim against Dr. Tripathi, yet still have failed to do so. Even so, with respect to Relators' claims against Dr. Tripathi related to billing of radiopharmaceuticals before July 15, 2022, Relators could not cure their pleading deficiencies by amendment since Dr. Tripathi was not practicing in a Novitas jurisdiction, and because all allegedly false claims associated with his services have already been resolved and dismissed with prejudice by these same Relators.[17] No conceivable amendment would allow Relators to recover twice. Even for the Arkansas claims, Relators could not cure the SAC's deficiencies because during that time period Dr. Tripathi's employer was contractually responsible for the acquisition of radiopharmaceuticals and the billing and submission of Medicare claims related to all the services he provided. Accordingly, any further attempts at amendment would be futile and would cause undue delay. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Mowrer v. United States DOT*, 14 F.4th 723, 732-33 (D.C. Cir. 2021).

## CONCLUSION

Relators fail to sufficiently allege FCA violations against Dr. Tripathi under any of the three counts in the SAC. Relators merely ask the Court to accept multiple assumptions that are not supported by credible information that is even relevant to Dr. Tripathi. For all but a few months of the alleged time period, Relators' claims against Dr. Tripathi fail as a matter of law, and even for the

---

[17] Relators' previous FCA suit against Dr. Tripathi's previous employer further indicates Relators have had ample opportunity to at least consult their own file, *United States ex rel. Jasjit Walia and Preet Randhawa v. Western Kentucky Heart & Lung Associates, PSC, et al*, No. 1:21-CV-126-GNS, before naming Dr. Tripathi in the instant suit.

remaining Arkansas claims, Relators wildly speculate that Dr. Tripathi submitted false claims to Medicare without providing any reasonable basis for such an inference. Relators' obvious failure to conduct even the most basic background investigation into the circumstances of Dr. Tripathi's alleged conduct before naming him as a Defendant in an FCA case further illustrates the lack of even plausible, let alone particular, claims stated against him in the SAC, and also prevents him from adequately responding to the SAC's vague and conclusory allegations.

Federal pleading standards require "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678, and Rule 9(b) requires far more specific allegations than the SAC contains here. Accordingly, Dr. Tripathi respectfully requests that Relators' claims against him be dismissed with prejudice.

Date:   July 21, 2025

Respectfully submitted,

*/s/ Robert J. Benvenuti III*
Robert J. Benvenuti III, *Admitted Pro Hac Vice*
(KY Bar No. 87462)
Holly R. Iaccarino, *Admitted Pro Hac Vice*
(KY Bar No. 93839)
**Barnett Benvenuti & Butler PLLC**
489 East Main Street, Suite 300
Lexington, KY 40507
T: (859) 226-0312
F: (859) 226-0313
robert.benvenuti@bbb-law.com
holly.iaccarino@bbb-law.com

Thomas M. Craig, D.C. Bar No. 494503
**Fluet**
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
tcraig@fluet.law
e-file@fluet.law

*Counsel for Defendant Avnish Tripathi, M.D.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 21, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will transmit a true and correct copy of the same to all Counsel of Record.

*/s/ Robert J. Benvenuti III*
ROBERT J. BENVENUTI III
